TARIK S. ADLAI, SBN 165454
LAW OFFICES OF TARIK S. ADLAI
65 No. Raymond Avenue, Suite 320
Pasadena, California 91103
Tel: (626) 578-7294
Fax: (626) 685-2562
E-mail: *tadlai@adlailaw.com*

Attorney for Petitioner
ZAREH MANJIKIAN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZAREH MANJIKIAN,<br><br>Petitioner,<br><br>v.<br><br>SEAN MOORE, Warden of Centinela State Prison; KATHLEEN ALLISON, Secretary of California Department of Corrections and Rehabilitations,<br><br>Respondents. | Case No. 2:22-cv-1865<br><br>PROTECTIVE PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner Zareh Manjikian, by and through his attorney Tarik S. Adlai, petitions this Court for a writ of habeas corpus on the grounds that he is unlawfully detained in the custody of the California Department of Corrections and Rehabilitation in violation of the laws and constitutions of the United States and the State of California.

Mr. Manjikian respectfully requests permission to amend or supplement this petition with additional allegations, declarations and supporting evidence as it has been filed expeditiously, before

1    counsel's investigation could be completed, to avoid potential

2    procedural obstacles.

3

4                                  Respectfully submitted,

5                                  LAW OFFICES OF TARIK S. ADLAI

6

7    Dated: March 21, 2022.            /s/ *Tarik S. Adlai*
                                     TARIK S. ADLAI
8                                    Attorney for Defendant
                                     ZAREH MANJIKIAN
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................... iii

TABLE OF AUTHORITIES....................................... v

INTRODUCTION............................................... 1

JURISDICTION............................................... 2

FACTUAL SUMMARY........................................... 2

STATEMENT OF FACTS......................................... 5

    A.    Yepremyan and Jurian Agreed to Meet At An
           Unspecified Future Time and Place................. 6

    B.    Manjikian Was Swept into the Meeting at the Last
           Minute by Circumstance of Timing. ............... 7

    C.    Yepremyan Sought and Prepared to Escalate the
           Meeting from a Conversation to a Confrontation. .... 8

    D.    Yepremyan Provocatively Escalated the Discussion
           from Respectful Conversation into a Hostile
           Interaction...................................... 10

PROCEDURAL HISTORY........................................ 13

CLAIMS FOR RELIEF......................................... 17

I.    The Prosecution Presented No Evidence, Relying
      Instead Only on Speculation, That Manjikian Brought
      and Brandished a Handgun.......................... 17

II.    Newly Discovered Evidence Confirms Manjikian Was
      Convicted Based on False Evidence about His Purported
      Use or Access to a Firearm. ...................... 19

    A.    New Evidence Refutes the Prosecution's
           Speculation that Manjikian Brought or
           Brandished a Firearm............................. 19

    B.    The New Evidence Corroborates and Reinforces
           Pashayan's and Asaturyan's Post-Trial Testimony... 23

    C.    Pashayan's and Asaturyan's Post-Trial Testimony
           Is Not Inherently Incredible...................... 26

    D.    The New Evidence was Material to the Outcome. .... 32

III.    The Trial Court Erred in Failing to Instruct on Theories
of Unintentional Homicide. . . . . . . . . . . . . . . . . . . . . . . . . .    37

    A.    The Evidence Was Consistent with an Unintended
Homicide. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

    B.    The Trial Court Erred in Failing to Instruct on
Accidental Death. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    39

    C.    The Court Erred in Failing to Instruct on
Involuntary Manslaughter. . . . . . . . . . . . . . . . . . . . . .    40

    D.    The Court's Failure to Provide Instructions on
Non-Malice Murder was Prejudicial. . . . . . . . . . . . . .    41

IV.    The Instructions Improperly Lightened the
Prosecution's Burden by Requiring Both Defendants to
Have Acted in Imperfect Self-defense to Reduce Murder
to Voluntary Manslaughter. . . . . . . . . . . . . . . . . . . . . . . . .    42

V.    The Prosecution Unfairly Tilted the Scales by Engaging
in a Campaign of Misconduct. . . . . . . . . . . . . . . . . . . . . . . .    43

    A.    The Prosecution Commenced its Campaign of
Misconduct by Seizing Mr. Manjikian's Privileged
and Confidential Legal Materials. . . . . . . . . . . . . . . .    44

    B.    The Prosecutors Deliberately Violated the Court's
Order Prohibiting Them from Eliciting Evidence
about Consulting with Lawyers. . . . . . . . . . . . . . . . .    47

    C.    The Prosecutor Improperly Questioned a Witness
to Suggest Manjikian Was Part of a Family of
Criminals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

    D.    The Prosecution Capped its Campaign of
Misconduct by Failing to Produce Discovery and
Then Questioning a Witness in Front of the Jury
Insinuating Without Foundation That a Defense
Witness Supplied the Murder Weapon. . . . . . . . . . . .    51

    E.    The Prosecutor's Closing Argument Improperly
Invited Convictions Based on Ethnic Stereotypes. . . .    56

CUMULATIVE PREJUDICE. . . . . . . . . . . . . . . . . . . . . . . . . . . .    61

RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    62

VERIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    64

iv

# TABLE OF AUTHORITIES

## *Federal Cases*

*Buck v. Davis,*
    137 S.Ct. 759 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Bush v. Vera*
    517 U.S. 952 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Calhoun v. United States,*
    568 U.S. 1206 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Data Disc, Inc. v. Systems Tech. Assoc.,*
    557 F.2d 1280 (9th Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . 23

*Edmonson v. Leesville Concrete Co.,*
    500 U.S. 614 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Hardnett v. Marshall,*
    25 F.3d 875 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 49, 50

*McKinney v. Rees,*
    993 F.2d 1378 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Danielson,*
    325 F.3d 1054 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . 47

## *State Cases*

*In re Sagin,*
    39 Cal.App.5th 570, 579 (2019). . . . . . . . . . . . . . . . . . . . . . 37

*Morrow v. Superior Court,*
    30 Cal.App.4th 1252 (1994). . . . . . . . . . . . . . . . . . . . . . . . . 47

*People v. Arredondo,*
    21 Cal.App.4th 493 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . 50

*People v. Barnett,*
    17 Cal.4th 1044 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Blackington,*
    167 Cal.App.3d 1216 (1985). . . . . . . . . . . . . . . . . . . . . . . . 55

*People v. Breverman,*
    19 Cal.4th 142 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*People v. Brothers,*
    236 Cal.App.4th 24 (2015). . . . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Concha,*
    47 Cal.4th 653 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*People v. Cook,*
    39 Cal.4th 566 (2006)............................... 40

*People v. Crew,*
    31 Cal.4th 822 (2003)............................... 48

*People v. Duvall,*
    9 Cal.4th 464 (1995)................................ 23

*People v. Elmore,*
    59 Cal.4th 121 (2014)............................... 40

*People v. Franklin,*
    63 Cal.4th 261 (2016)............................... 15

*People v. Gonzalez,*
    5 Cal.5th 186 (2018)................................ 40

*People v. Greeley,*
    70 Cal.App.5th 609 (2021).......................... 49

*People v. Guillen,*
    227 Cal.App.4th 934 (2014)......................... 40

*People v. Hamilton,*
    60 Cal.2d 105 (1963)............................... 56

*People v. Henderson,*
    58 Cal.App.3d 349 (1976)........................... 56

*People v. Huynh,*
    65 Cal.App.5th 969 (2021).......................... 50

*People v. Jennings,*
    50 Cal.4th 616 (2010)............................... 39

*People v. Lo Cigno,*
    193 Cal.App.2d 360 (1961).......................... 55

*People v. Lopez,*
    42 Cal.4th 960 (2008)............................... 50

*People v. Ochoa.*
    19 Cal.4th 353 (2008)............................... 40

*People v. Rios,*
    23 Cal.4th 450 (2000)............................... 40

*People v. Riser,*
    47 Cal.2d 566 (1956)............................... 56

*People v. Shockley,*
    58 Cal.4th 400 (2013)............................... 41

*People v. Smith,*
      60 Cal.4th 603 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    30

*People v. Suarez,*
      10 Cal.5th 116 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

*People v. Thomas,*
      53 Cal.4th 771 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40

*People v. Wagner,*
      13 Cal.3d 612 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    55

## Constitution and Statutes

U.S. Const.
      Amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46
      Amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30, 46
      Amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46
      Amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    60

28 U.S.C. § 2241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

Pen. Code
      § 192, subd. (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    40
      § 1473(b)(3)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

Senate Bill 1437 (2017- 2018 Reg. Sess.), Stats. 2018, ch.
      1015, § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30

## Texts and Articles

ABA STANDARDS FOR CRIMINAL JUSTICE,
      PROSECUTION FUNCTION (3d ed. 1993) Standard 3-5.8(c),
      p. 106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    61

Mariam Arain et al.,
      *Maturation of the Adolescent Brain* (2013)
      NEUROPSYCHIATRIC DISEASE & TREATMENT 449. . . . . . . . . .    58

Jeffrey Jensen Arnett,
      *Emerging Adulthood: A Theory of Development from the
      Late Teens Through the Twenties* (2000) 55 AM.
      PSYCHOL. 469. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    58

Kevin J. Holt,
      *The Inbetweeners: Standardizing Juvenileness and
      Recognizing Emerging Adulthood for Sentencing*

*Purposes After Miller* (2015) 92 WASH. U.L. REV. 1393. . . . 58

David Pimentel,
*The Widening Maturity Gap: Trying and Punishing
Juveniles As Adults in an Era of Extended Adolescence*
(2013) 46 TEX. TECH L. REV. 71. . . . . . . . . . . . . . . . . . . . . . . 58

# INTRODUCTION

1.      After insulting a young woman, Gombert Yepremyan escalated an initially-calm discussion into a violent confrontation that resulted in his death.  The task for the jury was whether Zareh Manjikian, someone who was originally just a bystander, caused Yepremyan's death and, if so, the degree of the homicide.

2.      Although the jury returned a verdict convicting Mr. Manjikian of first degree murder, the jurors were induced to convict by relying on false and misleading evidence which newly discovered evidence now demonstrates that Manjikian did not have or bring a firearm and that Yepremyan was shot by his own handgun that he brandished and threatened to use when escalating the conversation to a confrontation.

3.      The underlying trial was also compromised by the failure to deliver instructions on lesser included offenses of accident and involuntary manslaughter that jurors could reasonably conclude from the prosecution's evidence, an erroneous jury instruction that precluded the jurors from finding for Manjikian unless a co-defendant could also establish the same defense, and a campaign of misconduct running throughout the entire trial including invading the defense camp by seizing Mr. Manjikian's legal papers simply out of general curiosity and rummaging for evidence, the deliberate violation of court orders, attempts to insinuate Mr. Manjikian came from a family of criminals, concealing discovery while falsely insinuating a defense witness provided Manjikian with the missing murder weapon, and encouraging the jurors to decide the case based on ethnic stereotypes that Armenians were incapable of peacefully discussing

1

1    their differences without engaging in violence.

2

3                            **JURISDICTION**

4        4.    This court has jurisdiction to adjudicate this petition for

5    writ of habeas corpus.  28 U.S.C. § 2241.

6        5.    The judgment that is the subject of this petition was

7    pronounced in the Los Angeles Superior Court.  Venue properly lies

8    in this Court.

9        6.    Zareh Manjikian is serving a sentence of 50 years to life,

10   pursuant to a judgment of the Los Angeles Superior Court in

11   *People v. Manjikian*, No. BA38291, pronounced October 5, 2012.

12   He is being illegally and unconstitutionally restrained of his liberty

13   and is in the custody of Kathleen Allison, Secretary of the

14   California Department of Corrections and Rehabilitation, and Sean

15   Moore, Warden of Centinela State Prison.

16

17                        **FACTUAL SUMMARY**

18       7.    Zareh Manjikian was a young entrepreneur who grew

19   up in Los Angeles and owned medical clinics in Puerto Rico that he

20   personally attended to on regular occasions.  He had previously

21   been the part owner of a logistics company that supplied American

22   defense contractors.  His childhood friend Vahagn Jurian was

23   working in the transportation industry.

24       8.    Having planned to spend a friendly, relaxing evening

25   with his friend Vahagn, Zareh Manjikian was present by

26   happenstance when the decedent Gombert Yepremyan suddenly

27   called and asked to meet Jurian in person right away.

28       9.    Yepremyan had previously sent a text message to his

                                    2

girlfriend that included an offensive epithet referring to a friend of hers, one of Jurian's younger cousins.  The young woman, and then her brother, were offended and eventually consulted their older cousin Vahagn for advice.  Unable to calm down his cousin on the phone, Jurian met with the younger man in person; still unable to get him to relax, Jurian told his cousin to go home and that he, Jurian, would handle the issue.

10.    The foregoing was undisputed and established by the prosecution's evidence.

11.    Also undisputed is that Jurian reached out to Yepremyan in a handful of telephone calls that were, by all accounts, calm and not confrontational.

12.    Jurian continued with the rest of his afternoon and evening plans, which included an outing with his childhood friend Zareh Manjikian, until he received a telephone call from Yepremyan announcing that he was willing to meet and wanted to meet right away.

13.    In contrast to his less mature cousins, there was no evidence that Jurian was agitated, offended or upset by Yepremyan's callous text message.  Indeed, the evidence was to the contrary – that Jurian was calm and unperturbed by the exchange. Nothing suggested the matter was not going to be resolved with a simple apology upon informing Yepremyan of the hullabaloo he caused by his use of a vulgarity when referring to his girlfriend's girlfriend.

14.    There was contradictory evidence from the prosecution witnesses, however, as to Yepremyan's intentions.  Despite being conciliatory and cordial on the phone with Jurian, some of

Yepremyan's friends recalled that Yepremyan wanted to meet not so that he could apologize, but so that he could dig in his heels and justify his offensive language.  Others, however, said Yepremyan also understood that an apology would calm the waters and allow everyone to go on their way.

15.    When Yepremyan called, Jurian went to meet him. And, because Manjikian was already with him, he brought Manjikian in tow.  When they arrived at the location Yepremyan had chosen – a department store parking lot – they were met by Yepremyan and five others he "assembled . . . to back him up." Court's Ruling on Petitions for Writ of Habeas Corpus, Mar. 17, 2017, at 2.  One of those friends had brought a shotgun that, despite other's protests, Yepremyan had his friend put in the trunk of the car they drove to the meeting location.

16.    By all accounts, the interaction began calmly.  Some claimed Yepremyan even started to apologize.  Others, however, reported Yepremyan tried to justify his use of the offensive epithet. At some point early on, Yepremyan pushed Jurian, prompting Manjikian to come forward to defend Jurian from his larger assailant.[1]  After Yepremyan and Manjikian exchanged words that turned to one or two blows, prosecution witnesses testified Manjikian slapped Yepremyan with an open hand that made a loud "pop".  None of Yepremyan's friends claimed to have seen a gun in Manjikian's hands and none admitted knowing Yepremyan brought a gun (other than the shotgun in the car trunk).  Although none volunteered the fact before trial, two eventually acknowledged that

_____

[1].    The 6'1", Yepremyan weighed over 230 lbs.  Jurian was 5" shorter and 100 lbs lighter.

4

1  Manjikian and Yepremyan were struggling over an object when

2  their hands together struck Yepremyan's head.

3      17.    No one admitted to seeing a gun during the interaction.

4  As Manjikian and Jurian were running away, neither was holding

5  a gun, running as if they were carrying a gun, or seemingly trying

6  to hold or conceal a gun in their clothing.  Before the police arrived,

7  two of Yepremyan's friends also fled.  One removed the keys from

8  Yepremyan's pocket and then drove the friend who brought the

9  shotgun back home before returning to the scene.  When the police

10 arrived, no gun was to be found.

11     18.    The question for the jurors was whether Manjikian was

12 criminally responsible for Yepremyan's death and, if so, to what

13 degree.

14

15              **STATEMENT OF FACTS**

16     19.    The decedent, Mike Yepremyan, known to his close

17 friends as a "hot head," 17 R.T. 4581, instigated a confrontation by

18 insulting the moral integrity of a young woman and refusing to

19 apologize when invited to do so just to calm tensions.  When invited

20 to meet the young woman's older cousin and apologize, Yepremyan

21 told his friends he agreed to the meeting so he could "show that he

22 had evidence" justifying his offensive remarks.  16 R.T. 4698-99.

23 Incendiary remarks provoking unnecessary confrontations were not

24 new to Yepremyan.  Yepremyan was known to get into fights and

25 "this [had] happened before."  14 R.T. 4057; 15 R.T. 4369, 4377; 17

26 R.T. 4851.  Evidence not available at trial demonstrates that

27 Yepremyan's death was an accident, caused by a series of events he

28 put in motion, he exacerbated, and he stubbornly refused to derail.

A.    Yepremyan and Jurian Agreed to Meet At An
       Unspecified Future Time and Place

20.    Yepremyan referred to Vahagn Jurian's younger cousin Kat Vardanian as a "bitch" that, in Armenian culture, is similar to saying someone is literally a "whore" in a way that is "very harsh[]" and far more offensive in Armenian than the terms are understood in English.  14 R.T. 4066-67; Pashayan Depo. 28.  Upon seeing the insult, Kat, a 20 year old with only a high school education, blurted out "I'm going to have my brother kick his ass."  11 R.T. 3149.  She told her 18 year old brother about the insult and he was equally incensed. 16 R.T. 4589-91, 4613-14, 4686.

21.    Kat's brother Hovik reached out to their older cousin Vahagn Jurian at his girlfriend's house.  Juried tried, without success, to calm Hovik down over the phone, and then agreed to meet Hovik in person.  16 R.T. 4597.  Jurian agreed to meet with Yepremyan.  Hovik wanted to go also but Jurian said "No."  16 R.T. 4644.  Unsuccessful in "trying to calm" down his younger cousin who remained emotional and agitated, Jurian told Hovik "You're not going, you're upset.  I'm going to talk to him."  16 R.T. 4717-18.

22.    In contrast to Hovik who remained emotional and agitated, Jurian was "calm" and composed.  16 R.T. 4621.  Jurian was not asked to and did not offer to threaten or retaliate against Yepremyan or engage in any physical violence.  Jurian told Hovik that because he was so upset and wouldn't calm down, he was forbidden from meeting with or talking to Yepremyan about the episode.  Instead, Jurian offered to talk to Yepremyan, expecting he would be able to dial down tensions.  17 R.T. 4840.

23.    Hovik did not know Yepremyan.  Neither did Jurian.

6

Although Yepremyan's remark was offensive, Jurian did not find it something to be as upset over as Hovik was, let alone get in a fight over. Hovik provided Jurian Yepremyan's phone number. Without mapping out a specific plan, Jurian's general expectation was that he would contact Yepremyan, talk calmly to him, ask to meet in person, let him know that his use of the term "bitch" caused a lot of inter-family emotional turmoil and let him know it would calm everyone down if Jurian could tell them Yepremyan apologized. Jurian Decl.

24. Jurian reached out to Yepremyan, asked if he'd be willing to meet and talk. Yepremyan agreed. Yepremyan said he'd call back with a time and place later. Jurian did not demand to meet immediately or even that night. Although recognizing the meeting could have taken place that night, he expected only that it would occur in the near future. Yepremyan's calm and relaxed tone on the phone further assuaged Jurian that the meeting would not be confrontational. Jurian Decl.

## B. Manjikian Was Swept into the Meeting at the Last Minute by Circumstance of Timing

25. Zareh Manjikian eventually accompanied Jurian to the meeting with Yepremyan entirely by happenstance. Manjikian and Jurian had previously made plans to visit a mutual friend on the night of November 18, 2009. After the visit, as they were leaving together, Yepremyan called Jurian back and said he was at the meeting place and ready to meet. The incident had previously seemed so inconsequential Jurian had not even mentioned it to Manjikian. Jurian Decl. Moreover, Jurian hadn't even expected to

be contacted and asked to meet so quickly.  Jurian didn't ask to meet that night; he expected only that it would be soon.  After receiving Yepremyan's call and being asked to meet right away, Jurian told Manjikian of his need to meet briefly with someone. Jurian Decl.  As they were leaving their mutual friend's house, Jurian told Manjikian in the car as they were leaving that he needed to meet with Yepremyan in person, that he'd already spoken with him on the phone, it seemed like it would be a short and simple conversation, but Jurian needed to go then because Yepremyan was already waiting.  Jurian Decl.

26.    Jurian did not ask Manjikian for help nor expect him to be part of the discussion.  Jurian said it would be quick and non-confrontational.  Neither raised the possibility of needing any backup or weapons.  Jurian's words as well as his tone conveyed that no hostility or violence was expected.

27.    It is common in Armenian culture for people to meet in person and talk to iron out their disagreements.  14 R.T. 4056; 15 R.T. 4373, 4377-78.  As a fellow Armenian, Jurian expected Yepremyan shared that belief.  He didn't expect any need to gather up a bunch of people or secure a weapon with which to confront Yepremyan.  He had anticipated no violence or hostility, only a polite conversation after which, he hoped, Yepremyan might apologize.[2]

---

[2]    For all the sturm and drang he generated over his sister being called a bitch, even Hovik said all he would have wanted was an apology.  17 R.T. 4835.

8

C.    <u>Yepremyan Sought and Prepared to Escalate the Meeting from a Conversation to a Confrontation</u>

28.    Jurian's assumptions about Yepremyan turned out to be wrong.  Yepremyan was a veteran pugilist who had been in several fights.  15 R.T. 4369; 18 R.T. 5144-45.  He was only a year out of high school where even his friends described him as "irritable" and "easier to anger."  15 R.T. 4371, 4391.  Yepremyan "wanted to meet to show him he's not scared of these people, that he's not a bitch." 15 R.T. 4375.

29.    While Jurian was going about his life expecting the interaction to be a low-key affair, Yepremyan was busy rounding up friends to join him and provide backup or reinforcement. Rather than egg him on, Yepremyan's friends urged him to call off the meeting, 14 R.T. 4062; Yepremyan rebuffed the suggestion, saying he "didn't want to not show up," 20 R.T. 5773, rationalizing "Nothing I can do right now, if I don't do something, if I don't handle this everybody's going to think I'm a little bitch."  12 R.T. 3389, 3446; 14 R.T. 4065.  He insisted on going through with the meeting because he didn't want to look like a "pussy."  18 R.T. 5109; 19 R.T. 5483-84; 20 R.T. 5773.

30.    Yepremyan's friends accurately predicted that he could diffuse the entire situation if he would just retract his statements and apologize.  They told him to "just say sorry and just get it over with."  16 R.T. 4698-99.  But Yepremyan insisted he "didn't want to apologize."  16 R.T. 4698-99.

31.    Instead of apologizing Yepremyan "wanted to meet, to show that he had evidence of Kat being a bitch" and "tell the other people [] why he thought that she was a bitch."  16 R.T. 4698-99; 20

R.T. 5772.

32.    With Yepremyan's heels dug in, Yepremyan and his friends recruited others resignedly saying "We are going to fight. We need to fight.  Bring Art because we want to fight."  19 R.T. 5544-48.  By the time they arrived at the parking lot, Hosseini anticipated the "possibility that there could be a fight" because of "the way [Yepremyan] was progressing in his words."  18 R.T. 5279.[3]

D.    Yepremyan Provocatively Escalated the Discussion from Respectful Conversation into a Hostile Interaction

33.    When he arrived at the parking lot where Yepremyan asked him to meet, Jurian was surprised to be confronted by 6 people.  Jurian Decl.  Not expecting to be part of the conversation, Manjikian might not have even gotten out of the car had it not been that there were six people.  Although he got out of Jurian's car, Manjikian stood back, away from the others.

34.    Yepremyan was nearly 6" taller and nearly twice as heavy as Jurian.  Tr. Ex. 1; 13 R.T. 3814.  Several of Yepremyan's

_____

[3.]    While there was no evidence Jurian or Manjikian came anticipating a hostile interaction, all of Yepremyan's friends testified that they were preparing for a brawl.  Yepremyan and Hosseini were "trying to find friends that would come with us to just kind of, like, just in case something were to happen or just in case there was a fight or anything like that, we would have people on our side."  13 R.T. 3782.  Like Yepremyan, Bezjian was also "a fighter" who "would fight at times."  15 R.T. 4372.  Bezjian "was involved in martial arts," "some kind of mixed-martial arts," and "that's the reason that [Yepremyan] wanted me to call" him.  13 R.T. 3788; 18 R.T. 5280.  Bezjian thought "probably it was going to be a brawl."  17 R.T. 4851.  Yepremyan asked Barsamian to join him because, he said, "he might get in a fight," 13 R.T. 3756; 15 R.T. 4327, which is what Barsamian anticipated, 13 R.T. 3760-61; 16 R.T. 4526.

friends were also tall and muscular.  13 R.T. 3788-89, 3814; 14 R.T. 4043-44.

35.    Nonetheless, Jurian walked over to the group calmly and respectfully, introduced himself and shook everyone's hands. Everyone seemed calm.  Yepremyan's friends described Jurian as "friendly."  17 R.T. 4863.

36.    Jurian and Manjikian "didn't approach [Yepremyan and his friends] in an aggressive manner.  They just walked up."  18 R.T. 5201.  "The way they approached was just normal walk as if you're going to greet somebody," inspiring confidence in Bezjian that "we're going to be able to talk this out and just go on our ways."  18 R.T. 5201.

37.    Yepremyan's friends quickly recognized that Jurian wasn't looking for a fight, "all they ended up was wanting an apology."  17 R.T. 4864.  Yepremyan's friends recalled Jurian being "very respectful" and saying "an apology would be nice, that's all we need, that's all we want is an apology."  17 R.T. 4866.

38.    When Jurian began telling Yepremyan that his word choice caused a lot of consternation for his two cousins, instead of being empathetic or understanding, Yepremyan responded with callous disinterest.  Yepremyan "didn't want to apologize," 17 R.T. 4867, and apparently didn't care about easing tensions he had inflamed.  This was not a new situation for Yepremyan to be in. More than one of his friends knew Yepremyan had "been through this" or "this [had] happened before."  15 R.T. 4377; 17 R.T. 4851.

39.    Whether emboldened by the fact that Jurian was so much smaller than him, that Manjikian was standing back seemingly uninvolved and not acting as if he were there to back up

Jurian, his thinking "there was six of us, two of them," Pashayan Depo. 58, his own characteristic recalcitrance, or because he knew he had a gun he could use to intimidate them, instead of apologizing, Yepremyan escalated the casual conversation to hostilities by yelling out a pejorative Armenian insult and pushing Jurian. Jurian Decl.

40.    Although Jurian was calm, Yepremyan's friends recognized that Yepremyan "was pretty angry at that time in that moment." 18 R.T. 5161.

41.    Manjikian then interceded in defense of Jurian and pushed Yepremyan away from Jurian. The two took a couple swings at each other and Yepremyan pulled a gun out of his waistband. Pashayan Depo. 48. Before Yepremyan could aim it, Manjikian quickly grabbed hold of the gun with both hands to protect himself. Pashayan Depo. 48, 50. While struggling for control of the gun, it accidentally discharged. Pashayan Depo 53.

42.    Yepremyan's gun then fell to the ground. Pashayan Depo. 53. "Everybody just froze for a good second." Pashayan Depo. 53. Manjikian "had a look of surprise on his face when there was the gunshot." 18 R.T. 5201. Manjikian and Jurian "were as shocked as [Yepremyan's friends] were." Pashayan Depo. 53; 18 R.T. 5200-01.

43.    Manjikian and Jurian turned away and quickly left. They didn't pick up the gun or take it with them. 15 R.T. 4249; 20 R.T. 5851-52; Pashayan Depo. 54.

44.    While Edgar Asaturyan – who had just met Yepremyan for the first time – tended to Yepremyan's wounds and was trying to staunch the bleeding, two of Yepremyan's supposedly good

friends – Ali Hosseini and Jonathan Bezjian – fled the scene.  17 R.T. 4874; 18 R.T. 5106.  Hosseini pulled the keys to Yepremyan's car out from the pocket of Yepremyan's dead or dying body and drove away with Bezjian in Yepremyan's car.  18 R.T. 5107.  Hosseini reportedly drove Bezjian to his home and dropped Bezjian off with his shotgun.  18 R.T. 5109.  When people started looking for it at the scene, the gun that killed Yepremyan was nowhere to be found.

45.    Neither Jurian nor Manjikian presented themselves, behaved or moved as if either had any type of weapon on him.  18 R.T. 5175.  A search of Jurian's car did not unearth evidence of any firearm or ammunition.  25 R.T. 7262.

46.    A bullet fragment and a casing were found on the ground nearby.  It was impossible to tell whether the two were fired from the same gun.  27 R.T. 7956.  The bullet fragment could have been fired from a .357, .38, or 9mm handgun.  27 R.T. 7953.  Although found the same night as Yepremyan's death, the bullet fragment contained "no evidence that there's any bodily fluids or body matter on [it]."  27 R.T. 7952.

47.    Law enforcement was unable to obtain video footage from the parking lot's surveillance camera.  27 R.T. 7963.  The only percipient witnesses to testify about Yepremyan's and Manjikian interactions with each other were Yepremyan's friends.  There were no independent eyewitnesses.

## PROCEDURAL HISTORY

48.    Along with Jurian and his cousins, Manjikian was indicted by a grand jury on one count of conspiracy to commit

13

assault by means of force likely to produce great bodily injury.
Manjikian (and Jurian) was charged with one count of murder with
a then-mandatory firearm enhancement.  3 C.T. 548-50.

49.    Jury trial commenced July 2, 2012.  4 C.T. 714.   Two
months later, on August 3, 2012, the jury returned convictions on
both counts, found the murder to be first degree, and found the
firearm enhancements to be true.  1 C.T. Supp. 113-15.

50.    During the pendency of the direct appeal, the court of
appeal issued an order to show cause, returnable to the superior
court, on a habeas petition based on the acknowledgment by two of
the prosecution's witnesses that Yepremyan came to the scene
armed with a handgun and corroborated by the oral statement of a
third individual who overheard the decedent stating he had a
handgun and was looking for others to bring additional firearms.
OSC Apr. 29, 2015.  At an evidentiary hearing, the two trial
witnesses who clarified having seen the decedent with a handgun
invoked their privilege against self-incrimination which was
sustained on the ground that their presence could be viewed as
aiding and abetting an armed assault by the decedent, exposing
them to murder liability for Yepremyan's death under the now-
repealed natural and probable consequences doctrine.  Order, Mar.
17, 2017, at 22.

51.    Despite an Order to Show Cause finding their post-trial
sworn statements sufficient to establish a prima facie showing for
habeas relief, without hearing their testimony, the habeas court
rejected Pashayan's and Asaturyan's statements as "not . . .
sufficiently credible."  Order, Mar. 17, 2017, at 12.  The habeas
court found the then-uncorroborated oral statement of Aladadyan,

which was contradicted by Hosseini who was also on the call, not credible either.  Order, Mar. 17, 2017, at 18.  Although finding it to be a "close case" that "left a number of questions unresolved" and a prosecution theory that "simply doesn't make sense," the habeas court nonetheless found the scant evidence available at the hearing insufficient to warrant habeas relief.  Order, Mar. 17, 2017, at 20, 22.

52.    The court of appeal affirmed the convictions on direct appeal and summarily denied the appellate habeas petition.  *In re Manjikian*, No. B282459, Order (Feb. 28, 2018); *People v. Manjikian*, B250118 (Feb. 28, 2018).  The appellate court remanded with instructions for the trial court to exercise discretion whether to strike the firearm enhancements.[4]  The supreme court denied review.  *People v. Jurian*, No. S247850; *In re Manjikian*, No. S247880.

53.    On remand, the trial court declined to strike the firearm enhancements, a decision that was affirmed on appeal.  *People v. Manjikian*, No. B301488 (Feb. 10, 2021).  A petition for review would have been due March 22, 2021.

54.    Petitioner is contemporaneously filing petitions for a writ of habeas corpus in the United States District Court for the Central District of California and the Los Angeles Superior Court for the purposes of preserving his right to federal review of any and all claims.  Petitioner respectfully requests that this court hold this petition in abeyance pending resolution of his parallel state petition and, if need be, the exhaustion of state remedies.

---

[4].   The court also instructed the trial court to conduct a *Franklin* hearing.  *People v. Franklin*, 63 Cal.4th 261 (2016)

15

55.    Petitioner has no other actions, motions, appeals, applications or petitions pending in any other court regarding the validity of the judgment under attack.  Petitioner has not previously filed and litigated to final judgment any other petition for writ of habeas corpus in any other court with regard to this judgment.

56.    The claims raised in this petition for the first time are properly raised by way of habeas corpus instead of appeal or have not previously been presented to this or any other court in any other petition, motion, or application due to ineffective assistance of trial counsel, appellate counsel, the lack of access to competent counsel to advise regarding postconviction habeas and discovery, and the State's failure to comply with its constitutional obligations under *Brady* and *Napue* to disclose information to the defense and to correct false testimony when it arises.

57.    This petition is necessary because petitioner has no other plain, speedy, or adequate remedy at law for the substantial violations of his state and federal constitutional rights. Petitioner hereby incorporates by reference each and every paragraph of this petition into each and every claim presented in this petition as though fully set forth therein.

58.    The exhibits that may be filed in support of this petition are true copies of what they purport to be and are incorporated herein by this reference.

59.    Each and every claim herein is based on both the state and federal constitutions.  The arguments contained in any memorandum of points and authorities filed in support of his petition are incorporated herein.

1
2

# CLAIMS FOR RELIEF

3
4

**I.   The Prosecution Presented No Evidence, Relying Instead Only on Speculation, That Manjikian Brought and Brandished a Handgun**

5   60.    The fulcrum of the prosecutor's case was its hypothesis

6   that Manjikian brought, brandished, and then fired the handgun

7   that resulted in Yepremyan's death.  That theory turned on

8   speculation instead of evidence.

9   61.    Although three admitted they had lied for two and a

10  half years about not bringing a shotgun, each of Yepremyan's

11  friends insisted they did not personally bring a handgun.  Several

12  believed Yepremyan had not brought a gun but none was certain.

13  62.    All of Yepremyan's friends testified definitively that

14  they did not see Manjikian with a handgun.

15  63.    Although conceding that "[t]he witnesses that were

16  there, the five friends of Mike, the people he chose to bring with

17  him are kind of over – all over the place," 30 R.T. 8827, the

18  prosecution ignored its failure of proof and simply asserted that

19  Manjikian was the one who interjected a firearm into the meeting:

20
21

> Why would Zareh Manjikian take over a situation that involved Vahagn Jurian's cousin? . . .  Why?  Because he had a gun.

22  30 R.T. 8827.

23  64.    The prosecutor, however, identified no evidence that

24  Manjikian had a gun.  He simply assumed it and encouraged the

25  jurors to indulge in his speculation.

26  65.    The appellate court recognized on direct appeal, that

27  "there was quite striking testimony from several witnesses that

28  Jurian appeared completely shocked when the gun went off."  DCA

1    Op. 47.  The same was true about Manjikian.

2        66.    The appellate court also acknowledged that "The
3    evidence that Jurian knew Manjikian was armed was admittedly
4    not overwhelming."  DCA Op. 42 (brackets omitted).  The appellate
5    court, though, like the prosecutor overlooked the absence of
6    evidence that Manjikian was armed to begin with.  Evidence
7    Manjikian had a gun was not only "admittedly not overwhelming,"
8    it was non-existent.  Instead, like the prosecutor, the appellate
9    court erroneously assumed away the lack of evidence with
10   speculation.

11       67.    The appellate court implicitly acknowledged the
12   evidentiary gap in reciting that "Manjikian *apparently* brought a
13   loaded gun to the Sears confrontation."  DCA Op. 40 (emphasis
14   added).  The appellate court subsequently concluded that "Bringing
15   a gun to the Sears confrontation demonstrated Manjikian was
16   prepared to use deadly violence."  DCA Op. 41.  But the court never
17   addressed the evidentiary hole undergirding its assumption:  there
18   was no evidence Manjikian actually did bring a gun, no one ever
19   saw him with one, neither he nor Jurian were carrying a gun with
20   them as they left, and two of Yepremyan's friends fled the scene
21   taking at least one firearm away with them.[5]

22

23       [5]    The appellate court engaged in a similar analytical error in
24   analyzing Jurian's culpability.  In response to Jurian's appellate
     assertion that "Jurian did not have a weapon," the appellate court
25   refused to credit the fact despite the prosecution's failure of proof to
     the contrary, opining "we know no such thing; there was simply no
26   evidence at trial on this point one way or the other."  DCA Op. 33.
     The appellate court's indulgence in the speculative possibility that
27   Jurian was armed was contrary to the prosecution's burden to
     prove every fact beyond a reasonable doubt.  Because the
28   prosecution did not prove its assumption with evidence, it is in fact

## II. Newly Discovered Evidence Confirms Manjikian Was Convicted Based on False Evidence about His Purported Use or Access to a Firearm

### A. New Evidence Refutes the Prosecution's Speculation that Manjikian Brought or Brandished a Firearm

68. Yepremyan was killed by a 9mm bullet. The prosecution's percipient witness, all friends of the deceased Yepremyan, initially insisted they had brought no weapons of any kind with them until, a week before trial, one, and then others, admitted they had brought a shotgun but denied knowing of any handguns. At trial, each testified that none of them brought a 9mm firearm with them. Each one also testified either that Yepremyan had not himself brought a gun or, at least, as far as they knew, Yepremyan had not brought a firearm (other than Bezjian's shotgun that did not cause Yepremyan's injuries).

69. Although the prosecution's percipient witnesses all denied having seen Manjikian with a gun, there was no testimony definitively negating that Jurian or Manjikian had brought a handgun. The rest of Yepremyan's friends' testimony, along with the fact that the gun that killed Yepremyan was not at the scene after Manjikian and Jurian left, inspired the prosecution to speculate Manjikian and Jurian must have brought the gun that killed Yepremyan. The prosecution further speculated that, if they had brought the handgun, it was by pre-arrangement and, by inference, they anticipated using it. The prosecution's hypothesis rested on another false assumption that, like Kat and Hovik, Jurian had been emotionally invested in seeking revenge for the

_____

clear for purposes of this case that "Jurian did not have a weapon"; the same holds true for Manjikian.

1   insult to his cousin.

2       70.   Evidence unavailable at trial, however, confirms that

3   the prosecution's speculation was unfounded.  Previously

4   unavailable testimony confirms that neither Manjikian nor Jurian

5   brought a gun, witnesses saw that Yepremyan had brought a gun

6   with him, and rather than being emotionally roiled or invested,

7   Jurian sought a meeting to mediate and reduce tensions.

8       71.   Contrary to the prosecution's assumption that Jurian

9   was incensed about his cousin being called a "bitch" and telling

10  Hovik that he, Jurian, would be Kat's champion, 30 R.T. 8837; 31

11  R.T. 9178, while it was undisputed that Jurian excluded Hovik

12  from participating in the meeting, the new evidence confirms

13  Jurian did so because he wanted to calm the waters, not stir them

14  up further or keep them agitated.  Jurian Decl.

15      72.   A fundamental assumption underlying the prosecution's

16  theory was that Jurian brought Manjikian to "handle the situation"

17  or to serve as his backup.  Neither is true.  Jurian was not

18  anticipating a "situation."  He was calm.  He had spoken with

19  Yepremyan on the phone and he too was calm.  All the witnesses

20  said Armenians "like to talk" and Jurian anticipated meeting with

21  Yepremyan would be just that, a polite, non-aggressive

22  conversation where he could relay that Yepremyan's choice of

23  words agitated and offended others.  New evidence establishes

24  Jurian was neither anticipating nor preparing for violence.  An

25  apology was going to be more than enough.  Jurian Decl.  And an

26  apology was not even necessary although it would have been

27  helpful.  Even the lack of an apology would not have prevented

28  Jurian from calming down his cousins.  *Id.*

73. Jurian's perception of the "situation" was not something that called for firepower, extras, or backups. Jurian did not expect to need a firearm to confront 6 people because he had no idea he was going to meet 6 people. Jurian Decl. He was anticipating just a one-on-one meeting with Yepremyan. Indeed, not only had Yepremyan concealed from Jurian that he was bringing a posse, 14 R.T. 4075, but he also told others Jurian would not be armed. 19 R.T. 5554-55.

74. Moreover, Manjikian just happened to accompany Jurian by happenstance. Although Jurian had talked to Yepremyan about a meeting earlier that night, he put no time constraints on the meeting and had no reason to believe it would assuredly happen that evening. He picked up Manjikian that night in order for them to attend a pre-arranged visit with a friend who was departing on a trip the following day. He had not mentioned to Manjikian before picking him up about his future meeting with Yepremyan and gave Manjikian no notice that he might serve as backup for a meeting later that night. Jurian had no reason to expect Manjikian would come with a firearm with him, did not ask him to bring one, and gave Manjikian no reason to think one would be needed or helpful. Jurian Decl. Contrary to the prosecution's assumption, Manjikian was unaware of the drama involving Jurian's cousins when Jurian picked him up and had no reason to think about bringing a gun with him even if he were inclined to (which he wasn't). Jurian was not looking for an "enforcer" and Manjikian was not there as one.

75. Manjikian ended up being present because of the poor misfortune that he and Jurian were leaving their mutual friend's

1  home when Yepremyan called and asked Jurian to meet with him
2  right away.  Jurian Decl.

3      76.    As the trial court recognized, the prosecution's theory
4  was that Manjikian killed Yepremyan over "a text message that
5  offended somebody that Defendant Manjikian didn't even know."
6  Court's Ruling on Req. Strike Gun Alleg'n, Sept. 19, 2019, at 4.
7  Not only did Manjikian not know Kat, but it is inexplicable that
8  Manjikian would have been more offended or aggressive than
9  Jurian.

10     77.    Jurian excluded Hovik Dzhuryan precisely because he
11  did not want to risk Hovik's highly emotional state to cause a
12  confrontation.  He would not have brought Manjikian to do so in
13  Hovik's stead.  The prosecution's witnesses affirmed that Jurian
14  "didn't look like he was looking for a fight," nor act like it either.
15  18 R.T. 5175.  Although Yepremyan's friends showed up
16  anticipating a "brawl," even several of Yepremyan's friends were
17  "thinking there's going to be a conversation" and the sole purpose
18  of the meeting was "to go and talk."  14 R.T. 4018; Pashayan Tape
19  Recorded Interview ("TRI") Sept. 15, 2015, at 4.  Indeed, as Jurian
20  was only seeking an apology to calm his cousins, the only people
21  anticipating a violent confrontation were Yepremyan and his
22  friends.  14 R.T. 4042-43; 15 R.T. 4327; 17 R.T. 4851; 18 R.T. 5279;
23  19 R.T. 5548; see also 13 R.T. 3782 ("we were also expecting them
24  to do the same thing").

25         B.    The New Evidence Corroborates and Reinforces
26               Pashayan's and Asaturyan's Post-Trial Testimony

27     78.    The new evidence is not only sufficient to justify a new
28  trial in its own right, but it also puts the prior statements of

22

1  Pashayan and Asaturyan in a different and stronger light.[6]

2      79.    Pashayan recalled seeing that, after he arrived,

3  Yepremyan "pulled up his shirt" and displayed "a black pistol"

4  tucked in his waistband, telling Pashayan that "I got a 9 just in

5  case."  Pashayan Depo. 33-34; Pashayan TRI, Sept. 15, 2015, at 7.

6  Pashayan was "shocked" by the revelation and blurted out "What

7  the fuck?"  Yepremyan did not respond.  Pashayan Depo. 34;

8  Pashayan TRI, Sept. 15, 2015, at 21.

9      80.    After Yepremyan punched Manjikian, Pashayan saw

10  Yepremyan pull out his handgun, Manjikian "grab[] it with both

11  his hands," and then saw the two "struggling over the gun."

12  Pashayan Depo. 51-52.  They weren't hitting or punching each

13  other; they were just struggling over the gun.  Pashayan Depo. 52.

14

15  [6]    After Pashayan and Asaturyan both previously refused to
testify, invoking their 5th Amendment privilege based on potential
16  exposure to "murder on an aiding-and-abetting theory," the prior
habeas court previously declared that their post-trial revelations
17  were "lacking in credibility."  Court's Ruling on Petitions for Writ of
Habeas Corpus, Mar. 17, 2017, at 1, 22.
18      Without testimony from Pashayan and Asaturyan, the habeas
court was in no position to pass judgment on their credibility.
19  (*People v. Duvall*, 9 Cal.4th 464, 485-86 (1995).)  Except in "rare
cases where the facts alleged in an affidavit are inherently
20  incredible," a judge "has no basis for a determination of credibility"
based solely on the declarations.  (*Data Disc, Inc. v. Systems Tech.*
21  *Assoc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).)
      Pashayan's and Asaturyan's statements were not "inherently
22  incredible."  On the contrary, they were sufficient on their face to
establish a prima facie case for relief and prompt the Court of
23  Appeal to issue an Order to Show Cause.
      For purposes of the habeas ruling, however, the difference
24  was purely theoretical as, without their testimony, petitioner was
25  unable to prove the allegations.
      For purposes of the current petition, however, unlike at the
26  time of the prior hearing, with the enactment of Senate Bill 1437
27  (2017- 2018 Reg. Sess.), Stats. 2018, ch. 1015, § 2, Pashayan and
Asaturyan no longer face any threat of prosecution for murder are
28  available to testify.

1  "And next thing I know, I just hear a pop," that, he thought, could
2  have been a shot into the air.  Pashayan Depo. 52; Pashayan TRI,
3  Sept. 15, 2015, at 36-37.

4       81.    The gun then fell to the ground.  Pashayan Depo.  53.

5       82.    Pashayan was "shocked" and "Everybody just froze for a
6  good second."  Manjikian and Jurian "were as shocked as we were."
7  Pashayan Depo. 53.  Manjikian's facial expression made clear "he
8  wasn't expecting that to happen."  Pashayan TRI, Sept. 15, 2015, at
9  37.

10       83.    Manjikian and Jurian "ran to the car" and left.
11  Pashayan Depo. 54.  They did not pick up the gun off the ground or
12  take it with them.  "No, they didn't.  No, they didn't, for sure. . . .
13  Because after they left, the gun was still there" "on the ground."
14  Pashayan Depo. 54-55.

15       84.    Hosseini and Bezjian approached Mike's body and then
16  turned around and got into Yepremyan's car and left, immediately
17  after which the gun on the ground was gone.  Pashayan Depo. 55-
18  56; Pashayan TRI, Sept. 15, 2015, at 43-44.

19       85.    Pashayan's observation about the struggle over the gun
20  was corroborated by Asaturyan's trial testimony where he testified
21  to seeing Manjikian trying to push Yepremyan's hand down even
22  though he didn't see a gun in either's hand.  21 R.T. 6181, 6189.

23       86.    Although refuting the prosecution's theories and
24  arguments, the newly-discovered evidence that Jurian and
25  Manjikian did not bring a gun is entirely consistent with the
26  prosecution's evidence at trial.  Yepremyan told Hosseini
27  beforehand that the person he was meeting would not be carrying a
28  weapon.  19 R.T. 5554-55.  And that was borne out by all the

prosecution witnesses' direct observations.    Barsamian, Hosseini, Pashayan and Asaturyan all testified at trial Manjikian did not have or display a gun, 14 R.T. 3909, 19 R.T. 5457, 20 R.T. 5717, 21 R.T. 6094, 6179, 22 R.T. 6336, a fact Barsamian relayed to police that night, 16 R.T. 4543, 4546.  Bezjian said nothing to the contrary.  Barsamian and Asaturyan both testified at trial that Manjikian and Jurian did not do or say anything to suggest they had a gun.  15 R.T. 4230; 20 R.T. 5475; 21 R.T. 6324-25.  To Barsamian, nothing Manjikian or Jurian did or said indicated they were seeking a violent confrontation or were armed with a gun.  15 R.T. 4229-30.  The two were not carrying a gun, nor trying to put away a gun, when they were leaving.  15 R.T. 4249; 20 R.T. 5851-52.

87.    Asaturyan testified at trial that he could tell Manjikian's pockets were too small to conceal a gun, a fact he related to law enforcement that same night.  21 R.T. 6325-26; 22 R.T. 6357.

88.    While all the prosecution's witnesses affirmed they had not brought a gun (other than the shotgun that three lied about and concealed for 2½ years), 14 R.T. 4006, 4059, 15 R.T. 4223, 19 R.T. 5457, 5535, 5538-39, none could categorically deny that Yepremyan had brought a gun.  Hosseini said only "to [his] knowledge," Yepremyan did not have a gun.  Pashayan initially said only that Yepremyan did not have a gun "as far as what [he] knew."  21 R.T. 6040, 6132, a fact he later retracted.  Pashayan Depo. 33-34.  Asaturyan simply did not know, 19 R.T. 5457; 21 R.T. 6315, although he later acknowledged seeing Yepremyan behave as if he were armed.  Asaturyan Depo. 27, 29-30.  Indeed, Barsamian

noted that Yepremyan's shirt was untucked, covering his waistband, making it impossible to see whether he was hiding a gun there.  14 R.T. 4061.

89.   When Bezjian showed up at the car with a shotgun and Hosseini said "there's no need to bring a gun," Yepremyan did not argue about it but instead blithely opened the trunk for Bezjian, inviting him to bring it with them in a concealed location.  14 R.T. 4016; 19 R.T. 5552.  Yepremyan invited Bezjian along with his shotgun even though he knew the people he was meeting would be unarmed.  19 R.T. 5554-55.

90.   Of the 8 people present at the parking lot that night, Yepremyan and Bezjian were the only two with a history of fighting.  14 R.T. 4057; 15 R.T. 4369; 17 R.T. 4851; 18 R.T. 5144-45.

C.   <u>Pashayan's and Asaturyan's Post-Trial Testimony Is Not Inherently Incredible</u>

91.   The habeas court discounted Pashayan's post-trial disclosure because (a) his trial testimony was credible and (b) his stated motives for recanting closely paralleled his testimony at trial.  Those findings can't both be true.  If his disclosure is dubious because it parallels his trial testimony, then both are of questionable credibility.  Reasonable jurors could plausibly find that Pashayan used a similar explanation simply because he did not have an expanded and nuanced vocabulary.

*

92.   Pashayan testified that he was haunted by the vision of his friend's death occurring in front of him and that he was haunted by the fact that people were incarcerated for what he

1  personally witnessed to be an accidental shooting.  21 R.T. 6028,

2  6109; Pashayan Depo. 58, 89.[7]  Neither is inherently incredible.

3  The statements are not mutually exclusive.  Both are capable of

4  rationally co-existing in the same person at the same time.

5      93.    Notably, Pashayan's explanation for withholding

6  information about Yepremyan's handgun – empathy for

7  Yepremyan's family and not wanting to compound it with

8  information that their son's actions contributed to his own death –

9  is not facially implausible.  Indeed, it is nearly identical to

10  Hosseini's and Barsamian's rationalizations for concealing

11  information about the shotgun Yepremyan allowed Bezjian to bring

12  with them.  15 R.T. 4329; 20 R.T. 5761-62, 5774-75.  And

13  Yepremyan's girlfriend similarly admitted having lied because she

14  wanted to spare the Yepremyan family's feelings.  11 R.T. 3066-67,

15  3141; 12 R.T. 3402.[8]

16                                  *

17      94.    Contrary to the habeas court's assumption, the

18  accidental discharge is not inconsistent with the physical injuries

19  _____

20  [7]   "Because when your friend gets shot in front of you, first you
   don't sleep.  Every night for three years, I haven't slept normally
21  because when I go to sleep, I see that image."  21 R.T. 6109.
   "Because my friend died right in front of my eyes because of his
22  own gun . . . I can't go to sleep at night knowing by the fact that
   two people went to jail for an accident.  [¶]  I made a mistake of not
23  coming out and putting it all out there at one.  It's just that I felt so
   horrible that – how would I like – I'm sorry.  It's really king of hard
24  to explain."  Pashayan Depo. 89.

25  [8]   And it turned out not to be enough.  The Yepremyan family
26  told Yepremyan's former girlfriend "to go to hell" and wasn't even
   welcome at their house anymore because "they were upset with
27  [her] preliminary hearing testimony."  12 R.T. 3339, 3355-56.  They
   wanted her to "do [her] best to make Kat look bad" and thought she
28  was "trying to minimize Kat's involvement."  12 R.T. 3439.

1  Yepremyan sustained, including the existence of soot in the wound.
2  Nothing about the nature of the injury was inconsistent with an
3  accidental discharge.  The coroner refused to rule out that the gun
4  discharged by accident.  17 R.T. 4937, 4955-56.  Nothing about the
5  injury was inconsistent with a discharge during the course of a
6  struggle over the gun.

7      95.    The witnesses said the gunshot coincided with
8  Manjikian slapping Yepremyan on the side of the head.  That the
9  gun discharged in immediate contact with the skin while
10  Manjikian and Yepremyan were struggling over the gun is more
11  consistent with the gun discharging while striking a hard surface
12  (Yepremyan's head) than that it was calculatedly placed and
13  deliberately fired in exactly that location during a dynamic
14  situation.

15                              *

16      96.    The credibility of Pashayan's and Asaturyan's post-
17  conviction statements did not turn on whether they at any time
18  had "a pro-prosecution agenda."  Court's Ruling on Petitions for
19  Writ of Habeas Corpus, Mar. 17, 2017, at 15.  No one accused them
20  of having been prosecution hacks.  They never claimed to have been
21  prosecution hacks.  Their willingness to give unbiased testimony in
22  the past reinforces the credibility of their subsequent revelations.
23  They happened to be ordinary human beings with empathy for the
24  family of the deceased.

25      97.    The habeas court was only partially right in its
26  observation that "If [] Yepremyan had a gun that night, they would
27  have said so."  Order, Mar. 17, 2017, at 15.  Yepremyan did have a
28  gun that night and they should have said so.  They didn't.  But

1  that's no justification for refusing to correct an erroneous
2  conviction once new evidence comes to light.

3      98.    Just like the trial jurors likely overlooked Hosseini,
4  Barsamian and Bezjian's years-long concealment of Bezjian's
5  shotgun, reasonable jurors could similarly have concluded
6  Pashayan's and Asaturyan's delay in disclosing knowledge of
7  Yepremyan's handgun was undesirable but not negating in the
8  truth of their delayed revelation.

9                                    *

10     99.    Pashayan did not materially contradict himself.
11 Regardless of whether Pashayan was able to confirm whether
12 Yepremyan was shot with his own gun, Pashayan remained
13 unwavering that Yepremyan *had* brought a firearm with him and
14 that Yepremyan *had* drawn that weapon on Manjikian.  And,
15 notably, the *only* handgun any of the witnesses recalled seeing was
16 one initially in Yepremyan's exclusive possession.

17                                   *

18     100.  Jurian's and Manjikian's departure was equally
19 consistent with fear that their lives were in danger from
20 Yepremyan's friends.  It was undisputed that neither Manjikian
21 nor Jurian were carrying nor trying to secrete a handgun as they
22 returned to Jurian's car.  Characterizing their departure as "flight"
23 is circular reasoning that proceeds from an assumption of guilt.[9]

24                                   *

25     101.  Detective Townsend's testimony about an unrecorded
26 statement does not negate Pashayan's post-trial statements.  This

27 _____

28  [9.]   It can be said to have probative only if one ignores that
        Hosseini and Bezjian also fled the scene immediately thereafter.

1   is the same detective who was so invested in the prosecution that,

2   when he heard 2 years into the investigation that Yepremyan's

3   group brought a shotgun with them, instead of responding with

4   dispassionate inquiry, he reflexively interjected "Fuck!"  19 R.T.

5   5492, 5495.  The credibility of Pashayan's alleged uncorroborated

6   comment cannot fairly be resolved without Pashayan's testimony.

7       102.  Pashayan and Asaturyan were previously unavailable

8   as a witness at the earlier hearing because of a fifth amendment

9   privilege that no longer exists.[10]

10                                        *

11      103.  Rather than assess how reasonable jurors might

12  evaluate the evidence, the first habeas court's assumption that

13  Manjikian was "more likely" than Yepremyan to have escalated the

14  conflict is circularly premised on a presumption of guilt.

15      104.  Yepremyan chose the time of the meeting.  Yepremyan

16  chose the place of the meeting.  15 R.T. 4374; Jurian Decl.

17  Yepremyan chose to recruit and bring friends to the meeting that

18  was convened on his schedule.  Although urged against doing so,

19  Yepremyan allowed Bezjian to conceal the shotgun in the car's

20  trunk as they drove to the meeting location that he selected.  There

21  was evidence that Yepremyan insisted on having the meeting and

22  _____

23  [10].  The court initially sustained the claim of a fifth amendment
    privilege on the theory that "if they knew Mr. Yepremyan was

24  armed with a handgun, they could conceivably be charged with
    murder on an aiding-and-abetting theory."  Court's Ruling on

25  Petitions for Writ of Habeas Corpus, Mar. 17, 2017, at 22, citing
    *People v. Smith*, 60 Cal.4th 603 (2014).  The statute of limitations

26  for prosecuting either for perjury has expired and, with the passage
    of Senate Bill 1473 (Reg. Sess. 2017-2018), eliminating California's

27  natural and probable consequences theory for aiding-and-abetting
    liability for murder, neither has any exposure for a murder

28  prosecution either.

1  that he knew he could diffuse tensions by apologizing but
2  announced his refusal to do so to his friends beforehand.  Having
3  deliberately escalated what could and should have been a non-
4  confrontational interaction into an argument and fight, reasonable
5  jurors could reasonably have believed Yepremyan felt comfortable
6  escalating the situation precisely because he was armed with a
7  handgun.

8      105.  By contrast, reasonable jurors would have been fully
9  justified in concluding Jurian and Manjikian had little reason or
10  desire to exacerbate the situation.  The trial evidence revealed that
11  Jurian refused to allow his younger cousin Hovik to participate
12  precisely because he was concerned Hovik could not control his
13  anger and might escalate the situation instead of diffusing it.
14  There was no evidence Jurian expected he needed to be armed for
15  self-defense.  His telephone conversations with Yepremyan were
16  calm, not hostile, aggressive or confrontational.  Yepremyan
17  himself believed he had assuaged Jurian that he would have no
18  need to be armed.  And Jurian had no idea he was going to be
19  confronted by a posse.  He thought he was showing up for a one-on-
20  one meeting to discuss something like an adult.

21      106.  Nor did Manjikian have any apparent interest in
22  escalating tensions when his childhood friend Jurian was seeking
23  to diffuse them.  Manjikian did not prepare for the meeting with
24  Yepremyan; he did not even know it was a possibility when he left
25  home with Jurian.  Manjikian ended up being present only because
26  he happened to be with Jurian when Yepremyan telephoned Jurian
27  and asked to meet immediately.  Manjikian did not normally carry
28  a gun and, having been told nothing beforehand, there was no

1  reason for him to deviate from his normal habits.  Notably, no one
2  claimed to have seen him with a gun.

3      107.  Moreover, Manjikian did not have any "grievance."
4  Neither did Jurian.  Jurian simply intended to invite Yepremyan to
5  apologize, just what Yepremyan's friends encouraged him to offer
6  and which Yepremyan stubbornly refused to provide, suggesting
7  instead that he would provide "proof" that Kat was whoring herself.
8  Indeed, rather than Jurian and Manjikian bearing the grievance,
9  Yepremyan's friends said that it was Yepremyan who "was pretty
10  angry at that time in that moment."  18 R.T. 5161.

11      108.  In short, reasonable jurors could have concluded that, as
12  the person who escalated a one-on-one meeting into a six-on-two
13  confrontation and, despite his friends discouraging him from
14  allowing Bezjian to bring a shotgun, released the trunk latch so
15  Bezjian could load the shotgun inside and bring it with them, and
16  the only one with a history of violent confrontations who was
17  opposed to peace-making, Yepremyan was the one who brought his
18  own concealed weapon and escalated the interaction from a
19  conversation to a confrontation and was the one who drew a gun.
20

21      D.    The New Evidence was Material to the Outcome

22      109.  The new evidence is material to the outcome of the
23  underlying trial.  The prosecution's theory rested on four
24  fundamental assumptions, each of which is refuted by the newly
25  available evidence.

26      110.  The prosecutor erroneously hypothesized that Jurian
27  shared Kat and Hovik's desire to punish or seek revenge on
28

Yepremyan for his use of an epithet.  31 R.T. 9178.[11]  The new

evidence confirms that, regardless of whether Kat and Hovik

wanted to assault Yepremyan, Jurian did not agree to do so and

affirmatively refused and rejected their emotional investment.[12]

The new evidence repudiates the prosecutor's assumption and

establishes that, rather than assault Yepremyan, Jurian wanted to

de-escalate the situation.

111.  The prosecutor's assumption about Manjikian's

participation in a conspiracy is similarly mislaid.  In contrast to the

prosecutor's assumption that Manjikian was enlisted by Jurian to

---

[11]  "There was an exercise to harm Mike.  Whether you find that they wanted to seriously hurt Mike or just beat him up a little bit given that option that exercise, that agreement is there.  And from there the murder happened."  31 R.T. 9178.

The prosecutor also erroneously speculated that Jurian's intentions were identical to Yepremyan's intentions:  "Mike's actions tell you that he knew was going to happen, why else would he be bringing backup?  It's his actions that speak louder than words. . . .  Mike's actions show that the conversations that he had were not a situation where it was, you know, let's just meet and discuss this."  30 R.T. 8838.  But it didn't have to be that way.  Yepremyan may have been gearing up for a fight but Jurian was looking to diffuse the situation.  It devolved only because Yepremyan unexpectedly wanted to dig in his heels and didn't want to apologize but instead tell Jurian how poorly he thought of Jurian's younger cousin.  And even that didn't precipitate the fighting, but Yepremyan's bluster, cursing, and starting to bully Jurian is what prompted Manjikian to try to separate the two and end up becoming embroiled himself.

[12]  The appellate court identified only one passage of potentially conflicting evidence:  Barsamian's assertion that someone told Yepremyan that the evidence he brought "was going to dictate what would happen" at the meeting.  14 R.T. 4080.  The reference overlooked important caveats.  Barsamian did not attribute that statement to Jurian but, instead, clarified that "that's what [Yepremyan] told [Barsamian] the other person said," 14 R.T. 4081; 15 R.T. 4725-26.  On the defendants' hearsay objection, the trial court affirmed that Barsamian's statement came in "not for the truth of the matter and it's only a state of mind."  14 R.T. 4099.

"handle" Yepremyan, 30 R.T. 8826, 8837,[13] the new evidence reveals that Manjikian did not know about Kat and Hovik's complaint with Yepremyan before finding himself driven to the meeting, did not join in any conspiracy with Kat or Hovik and certainly didn't join any agreement that Jurian had also declined to participate in and, rather than being present by design, he was merely present by happenstance because he happened to be with Jurian when Yepremyan placed the call and wanted to meet at that moment.

112.   The prosecution's theory further rested on the assumption that, although he did not own any weapons, Manjikian must have been the person who injected a firearm into the situation.[14]   The new evidence refutes the prosecutor's speculation

---

[13.]   "Defendant Vahagn Jurian brought Zareh Manjikian to handle the situation.  And that's what the evidence shows is that, in fact, Zareh Manjikian was, in fact, brought to handle the situation."  30 R.T. 8826.  "Vahagn told Hovik he would take care of it.  And how did he take care of it?  As I indicated, he brought Zareh Manjikian with him."  30 R.T. 8837.

[14.]   The prosecutor argued Jurian "let Zareh Manjikian control the situation.  And that's the strongest evidence."  31 R.T. 9177. He continued:  "The most compelling evidence that Vahagn Jurian knew Manjikian had the gun and could handle the situation because there's no other rational reason we could speculate, but given the facts here there's no other reason to allow a stranger dealing with this insult from your cousin.  There's just none."  31 R.T. 9177.  "There's a way to get Mike to apologize, there is a way to deal with the situation.  We have a gun, we can deal with this. There are six of them, two of us, but we can deal with the situation. We're walking into this situation; we don't need to be concerned." 30 R.T. 8859.
       The prosecutor invited the jury to speculate:  "Does anyone seriously think that under these circumstances that they're going to walk up there without the ability to control the situation?"  30 R.T. 8839.  "Having that 9 millimeter handgun gave Zareh Manjikian a different kind of courage.  And that's why he wasn't afraid to push things."  30 R.T. 8827.

34

that Manjikian brought a gun.  It further provides reasonable
jurors with a foundation for understanding why imputing a gun to
Manjikian rested on pure speculation:  Manjikian was not known to
carry a gun and he ended up accompanying Jurian only by having
the bad fortune of being with Jurian when Yepremyan called and
insisted on a meeting in short order.  Even if he might have had
access to a firearm (which he didn't), the timing precluded him
from obtaining one (which he had no need to obtain since Jurian
assured him it would be a quick, casual discussion).

113.  The prosecution's theory also rested on the mistaken
assumption that Jurian was more mature and strategic in their
planning than any evidence warranted.  Although senior to the 18-
20 year old Kat, Hovik and Yepremyan, Jurian himself was only 23
years old.  Rather than intending to force an apology, Jurian hadn't
even contemplated the possibility Yepremyan would be so bull-
headed that he would refuse to apologize, let alone plan out a
strategy of physical confrontation to force an apology.  Rather than
force an apology, no different than Yepremyan and his friends, 14
R.T. 4079, typical of a post-adolescent brain, Jurian had not even
contemplated a contingent plan if the conversation didn't proceed
as expected.

114.  The new evidence also refutes the prosecutor's assertion
that "By all accounts, Mike tries to apologize."  30 R.T. 8840.
Although the prosecutor's assertion was a gross exaggeration of the
evidence because Yepremyan's own friends affirmed that
Yepremyan insisted he "didn't want to apologize," 16 R.T. 4698-99,
the new evidence adds credibility to Yepremyan's intransigence.

115.  Finally, the new evidence undermines the prosecutor's

theory that Jurian and Manjikian came armed because they expected to confront a crowd and deliberately escalated the confrontation to hostilities.  30 R.T. 8840-41.[15]  The new evidence, however, confirms that although Yepremyan's 18 and 19 year old friends were bracing for a fight, the 23 year old Jurian was looking to calm the waters and didn't show up with "backup" because he wasn't arriving to engage in a physical confrontation.

116.  By negating the assumption they brought a gun, the new evidence also refutes the assumption that their access to a firearm inspired them to "take over" or "escalate the confrontation."  30 R.T. 8827; 31 R.T. 9163.[16]  The new evidence directly contradicts the prosecutor's hypothesis that Jurian and Manjikian "escalate[d] the confrontation" to begin with;[17] Yepremyan did.

117.  Reasonable jurors likely shared the habeas court's view

---

[15].  "It's two against six.  It's because they have the great equalizer.  They have their – again, it's not liquid courage, but they have their gun for courage.  They have the gun for courage."  30 R.T. 8840.  "[T]hey didn't need to worry about these six guys.  [¶] Now, once the confrontation occurs, how does defendant Zareh Manjikian respond?  Pulls the gun out."  30 R.T. 8841.

[16].  "Zareh Manjikian took over.  Why?  Why would Zareh Manjikian take over a situation that involved Vahagn Jurian's cousin?  [¶]  Well, the answer's quite simple, because he was in a position -- remember, there's two against six, to deal with the situation.  Why?  Because he had a gun so he could deal with the situation.  That's why he took control."  30 R.T. 8827.  "Who took control of the situation?  From all accounts defendant Manjikian took control of the situation.  Well, that would seem to indicate there was a reason why because he's the one with the gun.  He was the one who could use the gun."  31 R.T. 9163.

[17].  "The only evidence is that the defendants escalated the confrontation."  30 R.T. 8840.  "Who escalated the confrontation? It's clear the evidence showed that it was the defendants who escalated it."  30 R.T. 8861.

that "[t]his was a close case" and the prosecution's theory "doesn't make sense."  Order, Mar. 17, 2017, at 20, 22.  Informed of the newly discovered evidence, reasonable jurors would probably have decided the case differently.[18]

## III.   The Trial Court Erred in Failing to Instruct on Theories of Unintentional Homicide

118.  The prosecution's evidence was consistent with the hypothesis that Yepremyan's death was not intentional.  Reasonable jurors could have found that Yepremyan's death was an accident or, at most, caused by a degree of criminal negligence amounting to manslaughter.  The trial court's failure to instruct on these viable theories of guilt was prejudicial.

### A.   The Evidence Was Consistent with an Unintended Homicide

119.  The prosecution presented no evidence Manjikian or Jurian bore any hostility or animosity towards Yepremyan.  The prosecution presented no evidence Manjikian (or Jurian) came armed with a gun.  No one claimed Manjikian pulled out a handgun and deliberately aimed it at Yepremyan.  No one claimed Manjikian or Jurian made any remarks expressing homicidal, murderous or even assaultive intent.  Although the prosecution's evidence indicated Manjikian physically hit Yepremyan with his hand the moment the gun discharged, there was no evidence Manjikian had his finger on the trigger let alone holding the gun's

---

[18]  That new evidence "would have more likely than not changed the outcome at trial," Pen. Code § 1473(b)(3)(A), "does not require an acquittal, but also encompasses a hung jury."  *In re Sagin*, 39 Cal.App.5th 570, 579 (2019).

37

1    handle.  Indeed, no one saw a gun in Manjikian's hands at all.

2        120.  All but one of Yepremyan's friends testified that, after

3    Yepremyan slugged Manjikian, the latter punched back and, when

4    his hand hit Yepremyan's head, there was the sound of a "firework

5    pop."[19]

6        121.  Manjikian "had a look of surprise on his face" when the

7    gunshot was heard.  18 R.T. 5200-01.

8        122.  Although classifying the death as a homicide, the

9    coroner couldn't, wouldn't, and didn't rule out the possibility that

10   the gun discharged by accident. 17 R.T. 4937, 4955-56.

11       123.  Defense counsel expressly asked the court to instruct on

12   accidental homicide but, crediting the full force of the prosecution's

13   evidence, the court refused.  28 R.T. 8103; 30 R.T. 8802-09.

14

15       B.    The Trial Court Erred in Failing to Instruct on
             Accidental Death

16

17       124.  Each of Yepremyan's friends who claimed to have seen

18   the final blow said the gunshot occurred right as Manjikian's fist or

19   ─────────────

20   [19.]  According to Barsamian, "Manjikian swung his arm in a
     right-hook punching motion at Yepremyan's neck or the back of his

21   head and simultaneously 'there was a flash and a bang.'
     Barsamian thought Manjikian had hit Yepremyan with an open

22   hand."  DCA Op. 10.  Bezjian testified that after being punched by
     Yepremyan, "Manjikian made a swinging motion and a gunshot

23   rang out and there was a smell of gunpowder."  DCA Op. 11; see
     also 18 R.T. 5128-29.  Hosseini said Manjikian "hit Yepremyan in

24   the side of the head with 'a hooking motion' and Hosseini 'saw a
     flash and heard a noise.'" DCA Op. 13 (ellipses omitted).

25   Asaturyan testified "Manjikian made a swinging or throwing
     motion, and his hand hit the back of Yepremyan's neck, at which

26   point Asaturyan heard a 'firework pop' and saw blood.  He did not

27   see a gun."  DCA Op. 14.
         At trial, Pashayan testified he was paying attention to Jurian

28   when a gunshot rang out and did not see it fired.  DCA Op. 12.

38

palm made contact with Yepremyan's head.  A swinging arm or punching motion is not how a handgun would normally be wielded by one intending to use it to fire a bullet.  The coroner testified that the gun was up against Yepremyan's head when it discharged, further supporting a conclusion that the gun misfired when it struck Yepremyan's head not necessarily the result of a deliberate decision to point and fire the handgun.

125.  Given the lack of evidence that Manjikian drew or deliberately aimed a gun at Yepremyan and the evidence that a gun discharged while Manjikian was seemingly trying to punch Yepremyan, jurors could reasonably conclude the gun discharged by accident.

126.  "The claim that a homicide was committed through misfortune or by accident amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime." (*People v. Jennings*, 50 Cal.4th 616, 674 (2010) (internal quotations omitted).)

127.  When jurors could conclude, as they could here, that Manjikian intended to punch Yepremyan but did not act with express or implied malice aforethought, an instruction on accident is "required to be given upon request." (*Jennings*, 50 Cal.4th at 675; accord *People v. Gonzalez*, 5 Cal.5th 186, 196 (2018).)

C.   The Court Erred in Failing to Instruct on Involuntary Manslaughter

128.  Involuntary manslaughter is a lesser included offense of murder. (*People v. Rios*, 23 Cal.4th 450, 460 (2000).)  The difference between these crimes is that murder is characterized by

malice, whereas involuntary manslaughter involves only gross negligence.  (PEN. CODE, § 192, subd. (b); *People v. Elmore*, 59 Cal.4th 121, 133 (2014); *People v. Ochoa*, 19 Cal.4th 353, 423 (1998).)  "If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence."  (*People v. Guillen*, 227 Cal.App.4th 934, 1027 (2014).)

129.  Similarly, "an accidental shooting that occurs while the defendant is brandishing a firearm in violation of section 417 could be involuntary manslaughter."  (*People v. Thomas*, 53 Cal.4th 771, 814 (2012).)

130.  "If the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter, failing to instruct on involuntary manslaughter would violate the defendant's constitutional right to have the jury determine every material issue."  (*People v. Cook*, 39 Cal.4th 566, 596 (2006); see also *People v. Brothers*, 236 Cal.App.4th 24, 33-35 (2015) [instructions on involuntary manslaughter are required when the jury could reasonably doubt whether the defendant harbored malice during the course of an inherently dangerous assault].)

131.  Substantial evidence in this context is evidence from which the jury could reasonably conclude the defendant committed involuntary manslaughter as opposed to murder.  (See *People v. Shockley*, 58 Cal.4th 400, 403-404 (2013).)  In determining whether the evidence rises to this level, the trial court should not evaluate the credibility of witnesses, which is a task for the jury.  (*People v. Breverman*, 19 Cal.4th 142, 162 (1998).)  Rather, the evidence must

be viewed in the light most favorable to the accused.  (*People v. Barnett*, 17 Cal.4th 1044, 1145 (1998).)

D.   <u>The Court's Failure to Provide Instructions on Non-Malice Murder was Prejudicial</u>

132.   The trial court's error in failing to instruct on unintended homicides was prejudicial.  Under the instructions delivered at trial, if the jurors found the gun discharged by accident while Manjikian was attempting to defend himself against Yepremyan's physical assault and physically struck Yepremyan with the gun (whether in his hands or in both their hands) and it discharged by accident, the jurors were still limited to treating the homicide as murder.

133.   As the trial judge recognized later,

> This was a close case.  The evidence presented at trial left a number of questions unresolved.  None of the witnesses ever saw Petitioners with a gun.  Mr. Bezjian and Mr. Hosseini drove away from the scene immediately after the shooting, abandoning their dying friend on the parking lot; their explanation – that they wanted to protect Mr. Bezjian's military record – is less than persuasive.

Court's Ruling on Pet'ns for Writ of Habeas Corpus, Mar. 17, 2017, at 20.

134.   The trial judge also recognized the non-sensical nature of the prosecution's theory:  that after refusing to bring Kat's brother because the latter was too emotional and threatened to escalate the situation, Jurian enlisted Manjikian to bring a loaded gun to a meeting intended to *de-escalate* tensions so that, when Yepremyan balked, he "shot Mr. Yepremyan in the head with it in a dispute over a single word in a text message that offended somebody that Defendant Manjikian didn't even know."  Court's

Ruling on Req. Strike Gun Allegation, Sept. 20, 2019, at 4.  This hypothesis "simply doesn't make sense."  Court's Ruling on Pet'ns for Writ of Habeas Corpus, Mar. 17, 2017, at 22.

135.  Without instructions on involuntary manslaughter, the jury did not have the full range of verdict options borne out by the evidence and violate Manjikian's constitutional right to have the jury determine every material issue.

## IV.  The Instructions Improperly Lightened the Prosecution's Burden by Requiring Both Defendants to Have Acted in Imperfect Self-defense to Reduce Murder to Voluntary Manslaughter

136.  The trial judge recognized that instructions on voluntary manslaughter were required because Manjikian or Jurian might have been acting in imperfect self-defense or imperfect defense of another.  28 R.T. 8104; 30 R.T. 8788; 4 C.T. 878.  In fashioning the instruction, however, the court did not allow the jury to consider the defense for *either* defendant unless it was available to *both* defendants.  That was wrong.  It was error.  It was prejudicial on this record.

137.  The trial court instructed:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if *defendants* Zareh Manjikian *and* Vahagn Jurian killed a person because *they* acted in imperfect self-defense or imperfect defense of another.

4 C.T. 878; 30 R.T. 8788.

138.  Because a defendant's culpability for murder is personal and depends on each defendant's *mens rea*, *People v. Concha*, 47 Cal.4th 653, 662 (2009),[20] it was error to direct the jury that it

---

[20].  "While joint participants involved in proximately causing a murder are tied to a single and common *actus reus*, the individual

1 | could not reduce the murder to manslaughter unless "they" both
2 | acted in imperfect self-defense or defense of another.

3 |     139.  The instructional error was inherently prejudicial but
4 | also clearly so on the facts of this case.  The evidence showed that
5 | Manjikian interceded only after the much larger Yepremyan
6 | physically pushed or assaulted the 130 pound Jurian who was a
7 | head shorter than his assailant.  There was no evidence, however,
8 | that Jurian was ever in any danger, let alone that he committed
9 | any act that caused the homicide in defense of himself or another.
10 | Because the instruction precluded the jury from considering
11 | whether Manjikian acted in imperfect defense of himself or another
12 | unless Jurian was similarly so acting, the prosecution's burden was
13 | lightened and Manjikian was deprived of the jury's consideration of
14 | a defense the trial judge believed was viable based on the trial
15 | evidence.

**V.  The Prosecution Unfairly Tilted the Scales by Engaging in a Campaign of Misconduct**

    140.  In a case that the trial judge conceded was "close," Order, Mar. 17, 2017, at 20, the prosecution tipped the scales in its favor by engaging in a pattern of misconduct.

    141.  The week before jury selection, the trial prosecutor and the two case detectives searched Mr. Manjikian's papers and seized privileged legal materials.  Rejecting the prosecutor's attempts to rationalize their actions, the trial judge found the prosecutor's

_____

*mentes reae* or levels of guilt of the joint participants are permitted to float free and are not tied to each other in any way.  If their *mentes reae* are different, their independent levels of guilt will necessarily be different as well." (*Concha*, 47 Cal.4th at 662 (internal quotations and ellipses omitted).)

actions amounted to "serious" "misconduct." 3 R.T. 605; 10 R.T. 2748.

142. Undeterred, however, the prosecutors deliberately violated a court order prohibiting them from eliciting evidence that the defendants' fathers encouraged other suspects to engage counsel rather than cooperate with police and offered to pay for their attorneys. They deliberately asked, for no good reason, whether any of Manjikian's relatives had ever been implicated in criminal misconduct. On the final day of evidence, without having disclosed the information in discovery beforehand, the prosecutors elicited evidence insinuating that a defense witness was the source of the missing murder weapon. Finally, notwithstanding the undisputed evidence that members of the Armenian community had a strong inclination to meet and talk as a way of resolving disputes, the prosecutor's closing argument invited the jurors to engage in ethnic stereotyping and assume that Armenian youths could not meet without resorting to violence.

A.    The Prosecution Commenced its Campaign of Misconduct by Seizing Mr. Manjikian's Privileged and Confidential Legal Materials

143. Just days before the presentation of evidence began, the prosecution asked jail deputies to collect all the correspondence and notes in Mr. Manjikian's jail cell which resulted in the seizure of a sizable volume of privileged material that included Mr. Manjikian notes of his conversations with his attorney and notes his attorney instructed him to prepare to assist in counsel's preparation and representation at trial. 10 R.T. 2748. The privileged material was stored in a separate redweld envelope marked "Legal Papers." 10

44

1   R.T. 2707, 2709.

2       144.  Mr. Manjikian learned by happenstance that his legal

3   materials had been seized by prosecutors when he noticed his legal

4   papers missing after returning to his cell following court.  When he

5   asked his jailor, he was told the commander had ordered the

6   seizure and copying of Manjikian's papers.  3 R.T. 602-03.[21]

7       145.  The prosecutors admitted that their seizure of

8   Manjikian's legal papers was not motivated by any law

9   enforcement or witness safety concerns but was purely an

10  evidentiary fishing expedition they sought to exploit because he

11  couldn't post bail.  5 R.T. 1223; 8 R.T. 2112-13.  The prosecutors

12  "didn't get a warrant."  10 R.T. 2748.  They delegated unfettered

13  discretion to the detectives as to how to obtain the material who, in

14  turn, left it to the jailors.  8 R.T. 2110.  As a result, "the

15  prosecution team got material that they weren't supposed to get.  It

16  is privileged under the attorney/client communication privilege.  It

17  is attorney work product because the attorneys asked their clients

18  to do this. [¶]  And it's part of the general Sixth Amendment right

19  to prepare – to help prepare your own defense."  10 R.T. 2748.  All

20  of these items, the trial court observed, "shouldn't have been

21  turned over."  10 R.T. 2748.

22      146.  Detectives Townsend and Kirkpatrick read everything

23  they received.  5 R.T. 1267; 9 R.T. 2563.  Detective Townsend

24  recognized that jail officers provided him materials that were

25  either privileged communications or related to Manjikian's case

26

27  [21.]  After Manjikian complained about the taking of his legal
28  papers, the prosecution acknowledged having clandestinely seized
    co-defendant Jurian's papers a week before it took Manjikian's.

preparation but he neither separated nor segregated the confidential information.  9 R.T. 2563, 2568.  Instead, he decided to give it all to the prosecutor and "let him figure it out 'cause it was his order."  9 R.T. 2567-68.

147.  Because it included privileged and confidential materials, "once the prosecution got it, the prosecution had an obligation to seal it and bring it to [the trial court]."  10 R.T. 2748.  "That wasn't done nor was the material immediately – when there was even some question that it might be legally related, it was not immediately segregated and brought to [court]."  10 R.T. 2748.

148.  Although the prosecution persistently attempted to rationalize the intrusion as tolerated by the Fourth Amendment because Manjikian was in custody because he couldn't post bail, the trial judge rightly rejected that argument, observing that the seizure of privileged materials implicated the Fifth and Sixth Amendments, and had no hesitation in concluding that "What happened here, I believe, is misconduct."  10 R.T. 2747.

149.  Although the prosecution bore the burden to prove that the defendant suffered no prejudice and that sanctions are unwarranted, *Morrow v. Superior Court*, 30 Cal.App.4th 1252, 1258 (1994); *United States v. Danielson*, 325 F.3d 1054, 1071-74 (9th Cir. 2003), both detectives reviewed all the privileged materials, and the prosecution subpoenaed several new witnesses shortly after seizing Manjikian's legal materials that mentioned those witnesses, the trial court found "no prejudice" because the detectives denied taking any investigative steps based on the substantive information they learned and the prosecutors denied reviewing it before it was impounded by the trial court.  10 R.T.

46

1  2749; 3 R.T. 605-09.

2

3      B.    The Prosecutors Deliberately Violated the Court's Order
             Prohibiting Them from Eliciting Evidence about
4            Consulting with Lawyers

5      150.  After a search warrant was executed on the house

6  where Gevorg Kirakosian lived with his parents and the

7  Kirakosian's believed police suspected their son was involved in

8  Yepremyan's death, Abraham Jurian and Samvel Dzhuryan (the

9  fathers of defendants Vahagn Jurian and Hovik Dzhuryan) told

10 Kirakosian's father that they would pay for an attorney if

11 Kirakosian was arrested and charged in the case.  The defendants

12 filed a motion in limine to preclude the prosecution from

13 introducing evidence of the defendants' fathers offer to pay for

14 Kirakosian's lawyer.  2 C.T. Supp. 22.

15     151.  The trial judge agreed, ruling that the "advice their

16 fathers gave to other people" was "extraneous and would not come

17 in."  2 R.T. 113.  "Any statements made by the parents [of the

18 defendants], that doesn't come in unless there's more substantial

19 proof that somehow it's been authorized by the defendants

20 themselves."  2 R.T. 114.[22]

21     152.  Notwithstanding the trial judge's unambiguous ruling,

22 when examining Kirakosian's girlfriend Jacleen Simjian, after

23 establishing that, upon learning of the search of Kirakosian's home,

24 Simjian's father advised Kirakosian to talk to the police and

25 Kirakosian said he was going to do that, the prosecutor started a

26 _____

27 [22.]  The trial judge reaffirmed the following day, in connection
   with other in limine rulings:  "The statements, the advice given by
28 father, . . . the court's ruling [was] whatever the father said or both
   parents said is not coming in."  2 R.T. 335.

                                47

1  follow-up that "in the interim, [Kirakosian] spoke to defendant
2  Jurian and defendant Dzhuryan's father" before being cut-off by an
3  objection that was sustained by the trial judge.  25 R.T. 7429-30.
4  Undaunted, the prosecutor started again "As far as you knew,
5  [Kirakosian] was going to go to the police—" before the trial judge
6  interrupted:  "Excuse me.  We are definitely – we're going to leave
7  it.  We're going to move on to a different area."  25 R.T. 7430.

8      153.  After Simjian completed her testimony, the trial judge
9  chastised the prosecutor for having "went into an area that I
10  specifically said don't go into which is were there any attempts by
11  the parents of the defendants to try and get lawyers for anybody."
12  25 R.T. 7438.  The trial judge emphasized "I specifically ruled in
13  my pretrial rules that it had nothing to do with anything, cannot be
14  attributed to the defendants."  25 R.T. 7439.

15      154.  The prosecutor tried to justify himself because
16  questioning by one of the lawyers "made it sound like he was going
17  into" the subject while simultaneously acknowledging "I believe
18  that it was unintentional."  25 R.T. 7439.

19      155.  The trial judge summarily rejected the proffered excuse:
20  "Just because you think a door's been open doesn't mean you get to
21  walk through it without my permission."  25 R.T. 7439.  He then
22  chided the prosecutor:  "come on, play[] right down the fairway."
23  25 R.T. 7439.

24      156.  There is nothing new about the rule that "It is
25  misconduct for a prosecutor to violate a court ruling by eliciting or
26  attempting to elicit inadmissible evidence in violation of a court
27  order." (*People v. Greeley*, 70 Cal.App.5th 609, 616 (2021) (internal
28  quotes omitted), quoting *People v. Crew*, 31 Cal.4th 822, 839 (2003);

48

see also *Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir. 1994).)
Moreover, "such misconduct is exacerbated if the prosecutor
continues to elicit such evidence after defense counsel has
objected." (*People v. Suarez*, 10 Cal.5th 116, 175 (2020).)

157.   The prosecutor succeeded in eliciting that Kirakosian
had told others of his intention to speak to police before the
intervention of defendants Jurian's and Dzhuryan's fathers and
that, after they intervened, Kirakosian never did end up speaking
with police.  The prosecutor offered no genuine or legitimate
justification for ignoring the trial court's pre-trial order.  Although
the prosecutor were foiled from eliciting that Jurian and
Dzhuryan's fathers sought to pay for Kirakosian's lawyer, they
nonetheless succeeded in informing the jurors that their fathers
intervened and likely succeeded in either persuading Kirakosian
not to voluntarily cooperate with law enforcement or somehow
prevented him from doing so.  The deliberate violation of the
court's pre-trial ruling was misconduct, exacerbated by the attempt
to persist despite defense counsel's objection and the court's initial
ruling, and contributed to prejudicing the outcome of the trial.

C.   The Prosecutor Improperly Questioned a Witness to
Suggest Manjikian Was Part of a Family of Criminals

158.   The defense called the attorney Manjikian hired to
negotiate the terms of bail for Mr. Manjikian's surrender.  The
lawyer identified her profession as "a criminal defense attorney."
27 R.T. 7927.  After the prosecutor elicited on cross-examination
that she was testifying based on her recollection not notes she had
brought with her, apropos of absolutely nothing, the prosecutor

asked whether "in the past have you represented any other members of the Manjikian family."  27 R.T. 7934.  The court sustained Manjikian's relevance objection after the lawyer already responded she did not recall.  *Id.*

159.  "There is no place in our system of justice for the notion of guilt by association."  (*People v. Huynh*, 65 Cal.App.5th 969, 984 (2021) (internal quotations omitted).)  Inviting jurors to infer guilt by association "constitutes misconduct."  (*People v. Lopez* 42 Cal.4th 960, 967 (2008).)[23]

160.  The prosecution made no offer of proof nor sought to rationalize its blatantly improper question.  The prosecutor's insinuation that Mr. Manjikian belonged to a family of criminals was blatant misconduct that contributed to prejudicing the jury against Mr. Manjikian.

D.    The Prosecution Capped its Campaign of Misconduct by Failing to Produce Discovery and Then Questioning a Witness in Front of the Jury Insinuating Without Foundation That a Defense Witness Supplied the Murder Weapon

161.  Based on a "hunch" and without any legitimate justification for doing so, the prosecution asked a series of questions insinuating that a defense witness provided Manjikian and Jurian with the murder weapon less than an hour before they met with Yepremyan.  The trial judge was "horrified," "staggered,"

---

[23].  Guilt by association has been "thoroughly discredited" in the American legal system.  (*People v. Arredondo*, 21 Cal.App.4th 493, 504 (2018).)  Reliance on an individual's *personal* responsibility "is a fundamental principle of American jurisprudence, inhabiting a central place in the concept of due process."  (*Id.* (internal quotations omitted).)

"dumbfounded" and "stunned" by the prosecution's "cavalier" decision to broach "this very, very hot topic" without "giving the defense a chance to perhaps clear it up so we don't even have this mess." 29 R.T. 8520.

162. Before the first witness was called in what was estimated to be a two-week trial, 5 R.T. 1235, the prosecution was given notice that Manjikian intended to call Artur Akopyan as a defense witness. 29 R.T. 8496. Over a month later, two weeks past the time estimate given to the jurors, and two weeks after the prosecution received a summary of Mr. Akopyan's anticipated evidence, Mr. Akopyan testified on the last day of evidence. 29 R.T. 8420, 8484-86.

163. Mr. Akopyan testified that Manjikian and Jurian visited him at his house for about 20 minutes on the evening of Yepremyan's death, about a half-hour before the two left to meet Yepremyan's gang. 29 R.T. 8424.

164. Forensics examination concluded that a bullet found in the near Yepremyan's body (assumed to be the fatal bullet) had been fired from a .357, a .38, or a 9mm handgun. 27 R.T. 7953; 29 R.T. 8492. On re-cross, without any advance discovery to the defense, the prosecutor asked a series of questions aimed at insinuating that Mr. Akopyan provided Jurian and Manjikian with the handgun that had gone missing. 29 R.T. 8464-65.

165. Outside the presence of the jury, while still trying to continue concealing their evidence and theory from the defense, the prosecution ultimately acknowledged trying to insinuate "Mr. Akopyan was the source of the weapon used in this case." 29 R.T. 8487. The prosecution conceded it had no idea whether any

firearm owned by Mr. Akopyan could have fired the bullet found near Yepremyan's body but, without advance disclosure to defense counsel, insinuated it in front of the jury on a "hunch." 29 R.T. 8495.

166.  The trial judge was harshly critical of the prosecution's tactics in failing to either seek the court's permission or provide discovery to the defense so the facts could be confirmed before the question was exposed to the jury:

> I have to say as I mull it over even more, I fail to see why the prosecution just didn't say at the start of the day, hey, we got a theory, let's hash it out.
> It got sprung on all of us in the middle of cross-examination of a witness and as mister – the thing Mr. Faturechi said, it's a hunch, the last day of the presentation of evidence in a month-long trial is no place for hunches.
> Frankly, criminal trials are no place for hunches. Hunches get hashed out in investigation, thoroughly vetted, thoroughly disclosed.  That's what happens to hunches.  Trials are for evidence.
> What's left right now is a hunch and a damaging one.  This is not the way it needs to be done.

29 R.T. 8510.

167.  "It's unfair and, frankly, horrifying if this implication were to be left out in front of the jury and the gun doesn't match up with the bullet." 29 R.T. 8496.

168.  The trial court repeatedly rebuffed the prosecution's attempts to disclose the justification for its inquiry to the court only *in camera* without informing the defense what information they were relying on.

169.  The prosecutor's eventual admission that "I knew that wasn't the gun," 29 R.T. 8516, didn't assuage the court either.

> I'm dumbfounded that the prosecution would present even by means of suggestion a theory in front of the jury that they hadn't fully explored.
> I'm dumbfounded that they would present

52

> evidence that is as inflammatory as this evidence without at least running it by me before they did it.
>       I'm staggered that nobody thought to hey, I'm suggesting that somebody might have actually provided the weapon that was involved in a homicide and I'm not going to check whether that guy might need a lawyer.
>       I am stunned by the fact that now this evidence having been presented, the prosecution, rather, cavalierly says, oh, I knew it wasn't the gun anyway.

29 R.T. 8519-20.

170.  Although the prosecution repeatedly tried to downplay the import of their questioning, the trial judge remained highly critical.

> What you threw out there was the notion that somebody connected with the defendants had a gun, that Mr. Nison's own admission, his theory was that that was the weapon that was used in the death, that's what he said to me in front of all of us.  That's where he was going with this.

30 R.T. 8725.

171.  The judge was equally upset about the prosecution's decision to not only conceal their hunch from defense counsel, but to try to continue to conceal their theory and explanation by refusing to disclose their position only *in camera*.[24]

172.  The judge stated he was "shaken by the fact that the prosecution seems to be winging it" on the last day of trial "when

---

24.       The thing that I find most objectionable is the notion that some forensic – or something that could lead to forensic evidence in this case, something that suggests you know where the weapon involved in Mr. Yepremyan's death came from, that that is something that you can spring on a witness, call it rebuttal, spring it on a witness in cross-examination, and then somehow think that you're entitled to have an ex parte communication with the court about it and somehow play it close to the vest.
      It's the playing things close to the vest that gets me.  That's not the way that the prosecution should present evidence of this nature.
29 R.T. 8513-14.

the case is finally going to get to this long-suffering jury" by broaching "this very, very hot topic without so much as a 'by your leave' from me.  Without so much as giving the defense a chance to perhaps clear it up so we don't even have this mess is to me stunning."  29 R.T. 8520.

173.  Mid-trial, let alone end of trial, was not the time for acting on hunches.  "A jury trial is not an investigative tool.  Jury trial is where the investigation having been completed, the evidence is presented."  29 R.T. 8523.

174.  Although the trial judge eventually instructed the jurors to disregard "any testimony involving possible ownership of guns by Mr. Akopyan," 29 R.T. 8525, the damage had already been done.

175.  The following day, the judge acknowledged "I was wrong" to have overruled an initial objection to the questioning of Mr. Akopyan regarding firearms and said he was "willing to go farther," and inform the jury that "the people's best information is that it was not the weapon."  30 R.T. 8720-21.  Although ballistics testing confirmed the following day that Mr. Akopyan's handgun had no connection to Yepremyan's death, 30 R.T. 8815, Jurian's lawyer refused to enter a stipulation referencing Yepremyan's gun, but instead asked for "a further admonition" that "goes a little farther" by indicating that the questioning itself "was inappropriate for this trial."  30 R.T. 8815.  Jurian's counsel objected to referencing any gun out of concern that it "could lead to more speculation on the jury's part," and that "another bell ringing now this gentleman did have a gun but, but it wasn't *the* gun" would unfairly benefit the prosecution when they "should never have even injected that."  30 R.T. 8815-16.

176.  The prosecution's unfounded and false insinuations undermined the fairness of the trial.  Notwithstanding the prosecutors' assumption that it was a basis for exculpating themselves, it remains misconduct to ask questions "impl[ying] the existence of facts which the People made no effort to prove and had no reason to believe could be proved," even when the question elicits a negative response.  (*People v. Blackington*, 167 Cal.App.3d 1216, 1221 (1985); *People v. Lo Cigno*, 193 Cal.App.2d 360, 378 (1961).)  Regardless of Mr. Akopyan's negative response, "[b]y their very nature the questions suggested to the jurors that the prosecutor had a source of information unknown to them which corroborated the truth of the matters in question." (*People v. Wagner*, 13 Cal.3d 612, 619 (1975).)

177.  Here, the prosecutor had no basis for believing Mr. Akopyan provided the defendants *any* weapon, let alone the gun that killed Yepremyan.  The prosecutors admitted acting on no more than a "hunch" that they had neither vetted, tested, nor investigated.  Not only had they failed to provide the defense with any discovery on that point, they resisted making any disclosure to the defense even after having dropped the bombshell in front of the jury.  It is well settled that a prosecutor may not interrogate witnesses solely "for the purpose of getting before the jury facts inferred therein, together with the insinuations and suggestions they inevitably contained, rather than for the answers which might have been given." (*People v. Hamilton*, 60 Cal.2d 105, 116 (1963).)

178.  Nor was the information in any way harmless or meaningless.  The very nature of the inquiry was prejudicial.  It is well recognized that evidence of weapons unconnected to the

1   charged crime, "leads logically only to an inference that defendant

2   is the kind of person who surrounds himself with weapons – a fact

3   of no relevant consequence to determination of the guilt or

4   innocence of the defendant." (*People v. Henderson*, 58 Cal.App.3d

5   349, 360 (1976); see also *People v. Riser*, 47 Cal.2d 566, 577 (1956);

6   *McKinney v. Rees* 993 F.2d 1378, 1381-82 (9th Cir. 1993).)

7

8       E.    The Prosecutor's Closing Argument Improperly Invited
           Convictions Based on Ethnic Stereotypes

9

10      179.  In a civilized society, people are expected to talk out

11  their grievances rather than exact retribution or resort to violence.

12  Not only is this ethos ingrained in the American psyche, but it is

13  especially firmly implanted in the Armenian-American community.

14      180.  All the prosecution witnesses noted that "setting up

15  these meetings is normal in the [Armenian] culture." 15 R.T. 4373,

16  4377-78. Barsamian elaborated "there is an Armenian thing that .

17  . . if there's a disagreement, two sides will meet up and discuss the

18  disagreement." 14 R.T. 4056. He explained that discussions of this

19  nature "happen often." 14 R.T. 4056. When asked to join

20  Yepremyan, Bezjian similarly opined "We're not kids anymore, let's

21  try to talk more like men." 17 R.T. 4858. Although familiar with

22  Yepremyan's tendencies as a "hot head," Bezjian nonetheless

23  believed the errant text message was "real small" that he felt

24  comfortable "probably we're going to go and talk it out." 17 R.T.

25  4850. Although soliciting others who might "want to fight,"

26  Barsamian elicited the same assurance from Yepremyan. He told

27  Yepremyan "let's just go talk and he's like, I know, that's my plan."

28  14 R.T. 4045.

181.  This wasn't just the civilized thing to do.  It was the Armenian thing to do.  As Pashayan told the investigating officers "The thing with Armenians is, they like to talk at first."  Pashayan TRI, Sept. 15, 2015, at 4.  That is exactly what Vahagn Jurian planned to do.

182.  The prosecutor, however, flipped the Armenian ethos around on its head and invited the jury to conclude that there was no such thing as a peaceful Armenian meeting.  The only possible outcome was a violent confrontation, a point he repeatedly stressed to the jurors throughout his summation.  With no evidentiary basis for doing so, he openly mocked the possibility that these Armenian youths could have a polite and respectful discussion without resorting to violence:  "Does anyone seriously think . . . the plan was to go and talk and if Mike doesn't back down, oh, we're just going to walk away?"  30 R.T. 8828.  He scoffed at his own hypothesis as "absurd."  30 R.T. 8828.  Entertained by his theory, he continued:

> But what was the end result of this meeting going to be?
> "Oh, Mike, yes you're right, she is a bitch, sorry we bothered you?"  The end result of this meeting was always going to be a violent confrontation unless Mike really backed down and apologized.

30 R.T. 8828.

183.  He came back to the exact same point 30 pages later:

> What's the end result of the circumstance?  "Oh, sorry, sorry to take up your time, Mike Yepremyan, we'll leave, we'll let you go, goodbye."  That's not going to be the end result.

30 R.T. 8859-60.

184.  The prosecutor's prediction that Jurian and Manjikian knew their conversation was destined to turn into a violent

57

confrontation overlooked that, although trying to handle the matter like adults, Jurian and Manjikian were still young adults. They had both only just turned 23 years old. Jurian knew enough to know from Hovik's behavior that allowing him to participate jeopardized the likelihood of maintaining a civil discourse. But, like many a post-adolescent with a brain that had not yet fully developed,[25] he hadn't even contemplated, let alone planned out, how to respond if Yepremyan didn't apologize. Jurian Decl.

185. The evidence offered no basis for speculating that Jurian's only motive or expectation was to engage in a violent confrontation. The prosecution presented no evidence that Jurian or Manjikian ever engaged in gratuitous violence or were themselves prone to violence or escalating verbal arguments into violent confrontations. Neither Jurian nor Manjikian had any criminal history or history of seeking personal vengeance. Neither was associated with criminal elements. Both were hard-working young men who were employed or just starting out in business. Nonetheless, the prosecution assured the jury:

> The reality is, what was going to happen after the discussion? You're going to have tea? . . . [It] was a situation where there was one outcome and it was going to be a fight. Okay? Is this – that was the one outcome of this meeting.

---

[25.]   Mariam Arain et al., Maturation of the Adolescent Brain, NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 449-61 (2013); Jeffrey Jensen Arnett, Emerging Adulthood: A Theory of Development from the Late Teens Through the Twenties, 55 AM. PSYCHOL. 469 (2000); David Pimentel, The Widening Maturity Gap: Trying and Punishing Juveniles As Adults in an Era of Extended Adolescence, 46 TEX. TECH L. REV. 71, 73 (2013); Kevin J. Holt, The Inbetweeners: Standardizing Juvenileness and Recognizing Emerging Adulthood for Sentencing Purposes After Miller, 92 WASH. U.L. REV. 1393, 1412 (2015).

30 R.T. 8838.

186.  Sitting down for tea is what Western and European diplomats do when trying to seek common ground.  Salvatore Prisco, *A Note on the Training of Professional American Diplomats, 1899*, 3 DIPLOMACY & STATECRAFT 143, 143 (1992).  Somehow, though, the prosecution repeatedly pressed the jury to believe Armenians could not behave similarly.  Although the uncontradicted evidence was that Armenians had a penchant for talking things out, the prosecutor could not fathom that, if one side was unsatisfied, they could avoid resorting to violence.

> Does anybody think that they were just going to calmly discuss Mike called my cousin a bitch or my sister a bitch, however it was going to be, and that Mike was going to explain his position and they were going to shake hands afterwards?  That just defies – that's just not the way the real world works, particularly under these circumstances.

30 R.T. 8840.

187.  The prosecutor had no basis for claiming Jurian could not "calmly discuss" Yepremyan's negligent use of insulting language other than that Jurian was Armenian.  Although the evidence uniformly stated that Armenians liked to talk, the prosecutor had no basis, apart from stereotyping, that it was inconceivable that they could do so calmly.

188.  The prosecutor returned to this theme in his closing argument as well.  "What was going to happen if Mike didn't apologize."  31 R.T. 9162, 9176.  "They were just going to talk about it.  Again, what were they going to talk about?  What was the end result going to be?"  31 R.T. 9164.  Although all his witnesses insisted that Armenians are strongly inclined to meet and talk – almost to the level of caricature – the prosecutor nonetheless

59

insisted:

> Vahagn Jurian did not go there simply to talk to Mike. Because again what was he going to do? The older cousin of Kat, what was he going to do if Mike said I'm not going to apologize which we already know was Mike's position. So he already knew that. So what was he going to talk to Mike about? Talk some sense into him? Yeah. But how are you going to do that? How is that going to happen? How are these two guys going to talk sense into Mike and his five friends?

31 R.T. 9175-76.

189. Separate and apart from the prosecutor's reliance on a false choice, the prosecutor identified no reason why Jurian or Manjikian would be intent on violence. The only evidence about Armenians was that they liked to talk. The prosecutor had no basis, apart from stereotypes or treating Armenians as "other," for arguing that "talk" was Armenian code for "fight."

190. The invocation of inferences based on racial or national origin stereotypes, even if only by implication, violates an individual's right to the equal protection of the laws. (*Bush v. Vera*, 517 U.S. 952, 985-986 (1996)("Our Fourteenth Amendment jurisprudence evinces a commitment to eliminate unnecessary and excessive governmental use and reinforcement of racial stereotypes"); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 630-631 (1991) ("If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury").)

191. Similarly, the prosecutor's appeal to the jurors' deepest prejudices about Armenians undermined Mr. Manjikian's right to an impartial jury. (ABA STANDARDS FOR CRIMINAL JUSTICE, PROSECUTION FUNCTION, Standard 3-5.8(c), p. 106 (3d ed. 1993).)

1    192.  The insinuation that Armenians could not talk without

2  fighting constituted a pernicious "attempt to substitute racial

3  stereotype for evidence, and racial prejudice for reason."  (*Calhoun*

4  *v. United States*, 568 U.S. 1206, 1208 (2013) (Sotomayor, J.,

5  concurring).)  Arguments appealing to prejudices undermine

6  respect for the judicial system and inherently impugn the

7  reliability of criminal verdicts.  Moreover, while it is clearly

8  recognized that toxins like prejudicial stereotypes "can deadly in

9  small doses," *Buck v. Davis*, 137 S.Ct. 759, 777 (2017), the

10  prosecutor's argument here could not be harmless as it was one of

11  the major premises upon which the prosecutor relied.

12

13                    **CUMULATIVE PREJUDICE**

14    193.  The foregoing errors and omissions, and each of them,

15  both singly and cumulatively, operated to deprive Zareh Manjikian

16  of his rights to a fair and reliable trial under the United States and

17  California Constitutions.  Even if no single error was sufficiently

18  prejudicial by itself to affect the verdict, the accumulation of errors

19  at Mr. Manjikian's trial cumulatively impacted the fairness of Mr.

20  Manjikian's trial.  The case was so weak and the prosecutor's

21  theory so attenuated any combination of the evidentiary,

22  instructional or misconduct issues likely caused or meaningfully

23  contributed to the jury's ultimate decision to convict.  The

24  combined effect of the structural, instructional and other errors

25  alleged herein were substantially prejudicial and undermined the

26  fundamental fairness of the trial and the reliability of the verdict

27  and judgment.

28

# PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court:

1.    Issue a writ of habeas corpus vacating the judgment in Case No. BA382910 and releasing Zareh Manjikian from the pains, burdens, and penalties imposed as a result thereof or issue an order to show cause to inquire into the legality of petitioner's continued restraint and restrictions on his liberty;

2.    Grant Petitioner the authority to issue subpoenas for witnesses and documents necessary to prove the facts alleged in the petition;

3.    Require Respondent to bring forth the entire state court record so that this Court can review those parts of the record relevant to the issues and defenses raised in these proceedings;

4.    Permit Petitioner to amend his petition to allege any other basis for his unconstitutional confinement as it is discovered, further developed, or becomes ripe for habeas review;

5.    Conduct an evidentiary hearing at which proof may be offered concerning all the allegations in this petition;

6.    Issue a writ of habeas corpus to have Petitioner brought before this Court to the end that he might be relieved of his unconstitutional sentence imposed in Case No. KA094626;

7.    Permit petitioner access to the Court's process and to propound and compel answers to discovery.

8.    Grant such other relief as this Court may deem appropriate.

1

2

3

4   Dated: March 21, 2022.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

LAW OFFICES OF TARIK S. ADLAI

/s/ *Tarik S. Adlai*

TARIK S. ADLAI
Attorney for Defendant
ZAREH MANJIKIAN

63

**VERIFICATION**

I, Tarik S. Adlai, declare as follows:

     1.    I am an attorney admitted to practice law before all courts of the State of California.  I am the attorney for petitioner Zareh Manjikian.  In accordance with Code of Civil Procedure § 466, I am authorized by Mr. Manjikian to file this petition for writ of habeas corpus.  Mr. Manjikian is confined and restrained of his liberty by the California Department of Corrections and Rehabilitation, in the custody of Warden Sean Moore of Centinela State Prison in Imperial, California.  I make this verification on Mr. Manjikian's behalf because he is detained at a custodial institution outside the county in which my office is located and because the truth and accuracy of the facts contained herein are more within my knowledge than his.

     2.    I have read the foregoing petition for writ of habeas corpus and am personally familiar with the files and records of this case.  The allegations contained in the petition are based on the record of trial court proceedings which are subject to judicial notice, are based on facts personally known to me, or I am informed and believe the matters therein are true and, on that ground, allege that the contents of the petition are true.  If called as a witness, I could and would testify thereto.

     I declare under penalty of perjury of the laws of the State of California that the foregoing is true and that this declaration was executed this 21st day of March 2022, at Pasadena, California.


               /s/ *Tarik S. Adlai*

               TARIK S. ADLAI